[No. D048471. Fourth Dist., Div. One. Dec. 11, 2006.]

In re H.G., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
MARY H. et al., Defendants and Appellants.

**COUNSEL**

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Simon G.

Linda M. Fabian, under appointment by the Court of Appeal, for Defendant and Appellant Mary H.

**4**

John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Suzanne F. Evans, under appointment by the Court of Appeal, for Minor.

## OPINION

**IRION, J.**—Mary H. and Simon G. (together, parents) appeal an order under Welfare and Institutions Code section 387[1] removing their daughter, H.G., from the home of her paternal grandparents (Grandparents). They also appeal a judgment terminating their parental rights to H.G. under section 366.26. We hold the court erred when it sustained the San Diego County Health and Human Services Agency's (Agency) supplemental petition under section 387 without considering whether the child's placement was no longer appropriate in view of the criteria in section 361.3. We reverse the order under section 387 and necessarily reverse the judgment terminating parental rights, rendering moot Mary's and Simon's challenges to the court's findings under section 366.26.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 12, 2004, Simon was walking with H.G., then age three. H.G. was underdressed for the weather and appeared to be extremely cold. She was crying. Simon had been drinking. A concerned citizen called the police. Simon told the officer that he and H.G. were homeless and they had been sleeping on the street. H.G.'s mother was transient and Simon did not know where she was. H.G. had not eaten recently. Simon was taking his daughter to his parents' home to ask them to care for her.

The officer contacted H.G.'s grandparents. Grandparents were afraid of Simon because of his violent temper and criminal history. They refused to accept responsibility for H.G. The police officer took the child into protective custody. A few days later, H.G. was detained with a maternal aunt (Aunt).

The Agency filed a petition under section 300, subdivision (b) alleging H.G. had suffered or was at substantial risk of suffering serious physical harm or illness due to her parents' failure to provide adequate shelter,

---

[1] Unless otherwise indicated, statutory references are to the Welfare and Institutions Code.

clothing and supervision. The Agency also alleged under section 300, subdivision (g) that H.G. was left by her parents without any provision for support. In April, the Agency filed another count under section 300, subdivision (b), alleging H.G.'s mother, Mary, had an admitted history of marijuana and methamphetamine use, including recent use, and allowed Simon to care for H.G. knowing he used alcohol, marijuana and methamphetamine. The Agency reported that Mary had a history of child welfare referrals concerning four older children, dating back to 1987.

On April 15, 2004, Mary and Simon submitted to jurisdiction and to the Agency's recommendations for disposition. The court removed H.G. from parental custody, placed her with Aunt, and ordered a plan of family reunification. Services included counseling, parenting education, and substance abuse treatment and testing through the Substance Abuse Recovery Management Systems program (SARMS).

In July 2004, Simon and Mary entered a faith-based residential treatment program that provided drug and alcohol treatment, anger management counseling, a 12-step program and other support services. Mary and Simon responded "extremely well" to substance abuse treatment. Mary worked her way into a leadership position with the faith-based program, and Simon was employed full-time with an affiliated construction company. H.G. visited her parents every week and was excited to see them. She was happy and well adjusted in Aunt's care.

In March 2005, the court placed H.G. with Mary on a 60-day trial visit. The social worker reported H.G. was happy to be with her mother and frequently visited her father. At the 12-month review hearing in April, the court returned H.G. to Mary's custody.

On August 2, 2005, the Agency received reports that Mary and Simon had left the recovery program after Mary tested positive for methamphetamine, and Simon was drunk and refused to test. Their whereabouts, and H.G.'s, were unknown. On August 23, Simon came to Agency offices seeking treatment services. He reported that he and Mary had relapsed, and she had left him, taking H.G., his van, and his money. Simon did not know where they were. The social worker referred him to SARMS and Simon reentered residential treatment the next day. On September 27, Simon visited Agency offices to inform the social worker that Mary and H.G. were staying at a motel in El Cajon. They were located that evening.

H.G. was detained at Polinsky Children's Center while the Agency evaluated her relatives for placement. On October 19, 2005, the Agency placed H.G. with Grandparents and, in November, the court confirmed the placement order and authorized Grandparents to exercise H.G.'s education rights and provide legal consent for her medical, surgical and dental care.

Grandparents enrolled H.G. in preschool, attended to her dental and therapeutic needs, invited the extended family to celebrate her fifth birthday, took her camping, and provided a safe and loving environment. Grandparents were open to visits and outings by H.G.'s extended family and were "very cooperative" in ensuring H.G.'s court-appointed special advocate (CASA)[2] was able to visit her frequently. The CASA considered the placement "highly successful" and observed that H.G. seemed very happy with Grandparents.

The court terminated Mary's and Simon's reunification services in November 2005 and set a section 366.26 hearing. Grandparents initiated the adoption process. On December 30, 2005, social worker McAdams was assigned to the case.

In late December 2005, Grandparents' youngest son became critically ill. He died on January 7, 2006. Simon attended the funeral and services on January 12 and 13. When the CASA called the home several days later to see how the family was doing, Simon answered the telephone. The CASA was concerned Simon was living in the home and contacted the Agency.

The social worker spoke to Simon's mother (Grandmother) on January 18, 2006, about Simon's presence in the home. Grandmother told her that if she wanted to have her son in her home, she would do so. The following week, H.G. told the social worker that her father tucked her into bed at night and Grandmother "smacked" her on the head because she would not kiss her great-grandmother.

On February 1, 2006, the social worker picked up H.G. from Grandmother, told Grandmother she was taking H.G. to visit her mother, and instead placed H.G. in temporary foster care.[3] The Agency filed a petition under section 387, alleging that H.G.'s placement with Grandparents was no longer

---

[2] A court-appointed special advocate is a trained volunteer appointed by the court to provide independent factual information to the court and to represent the best interests of the children involved, and consider the best interests of the family, regarding the cases to which he or she is appointed. (§ 102, subd. (c); see § 100 et seq.)

[3] We are troubled by the social worker's misrepresentation to Grandmother and H.G.'s abrupt removal. H.G.'s visit with her mother occurred the day after she was removed from Grandparents. In addition, the social worker assured the CASA that any removal would not occur without notice.

appropriate in view of the criteria in section 361.3 because Grandparents allowed Simon to have unauthorized contact with H.G.

In February 2006, five-year-old H.G. was diagnosed with posttraumatic stress disorder and reactive attachment disorder, disinhibited type.[4]

On March 8 and April 13, 2006, the court held a contested adjudication and disposition hearing under section 387. The CASA reported that she telephoned Grandparents' home on January 17, 2006, and Simon answered the telephone. He told her his parents were picking up H.G. from school and then running errands.

Grandmother testified that her youngest son passed away on January 7, 2006. She had not had any contact with Simon for three years. She did not invite him to his brother's funeral. Services were held in church on January 12 and in Grandparents' home on January 13. Grandmother was "out of it for days" and she was only vaguely aware of Simon's presence. H.G. was home, playing with her cousins. Grandmother did not invite Simon into her home after the funeral. Their relationship was not good. Although she would love to have him in her life, she was unable to accept him as he was. Grandmother denied hitting H.G. She did not remember talking with the social worker about Simon's presence in her home.

Simon testified he went to services at the church and saw H.G. from a distance. She saw him and waved, and he waved back. He went to Grandparents' home the next day. H.G. was playing in the backyard with her cousins. She said, "Hi Daddy," and he answered, "Hi Sweetheart." Simon did not come to the home to see H.G.; he was there to pay his respects to his deceased brother and to comfort his mother.

The court found that the testimony Simon visited or was in Grandparents' home was credible and concluded that Simon had unauthorized contact

---

[4] "The essential feature of Reactive Attachment Disorder is markedly disturbed and developmentally inappropriate social relatedness in most contexts that begins before age 5 years and is associated with grossly pathological care. . . . [T]he condition is associated with grossly pathological care that may take the form of persistent disregard of the child's basic emotional needs for comfort, stimulation, and affection . . . ; persistent disregard of the child's basic physical needs . . . ; or repeated changes of primary caregiver that prevent formation of stable attachments (e.g., frequent changes in foster care . . . .)" (American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders Text Revision (4th ed. 2000) § 313.89, pp. 127–128 (DSM-IV-TR); see, e.g., *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 727 [68 Cal.Rptr.2d 239]; *In re Krystle D.* (1994) 30 Cal.App.4th 1778, 1792 [37 Cal.Rptr.2d 132].)

with H.G. on more than one occasion, in violation of juvenile court orders. The court observed there were "a lot of mitigating factors," but a section 366.26 hearing was imminent. The court did not believe H.G.'s removal was pretextual because, after a section 366.26 hearing, the Agency has broad discretion to determine the child's adoptive placement. The court found that, in view of the entire history of the case, the previous disposition was not effective in protecting H.G.

After a short break, the court proceeded to a contested hearing under section 366.26. The social worker opined H.G. was adoptable because she was a very bright and pleasant child who did not have any overt disabilities. H.G.'s current foster parents wished to adopt her and she would be adoptable even were they not available. Her diagnosis of reactive attachment disorder was a serious psychological disorder; however, the condition would likely be ameliorated by a permanent placement.

The social worker did not believe terminating parental rights would cause H.G. to suffer serious detriment. Simon's relationship with H.G. was inconsistent and sporadic, and not parental in nature. H.G. did not view Mary as her psychological parent because Mary had not provided her with the security, stability and trust needed to establish that relationship.

Mary testified she raised H.G. for four and one-half years and regained custody for four or five months. During their visits, H.G. wanted Mary to hold her for lengthy periods of time. H.G. was normally a happy and outgoing child but lately she seemed sad and withdrawn. Mary wanted the best outcome for H.G., even if that meant adoption. However, she believed it was not in H.G.'s best interests to lose all contact with her.

The court found that H.G.'s diagnoses of reactive attachment disorder and posttraumatic stress disorder did not preclude a finding of adoptability. Characterizing the case as "difficult," the court stated that it did not doubt H.G. loved her mother and would miss her, but questioned the quality of her attachment to her mother in view of Mary's history of drug abuse, homelessness, and instability. The court determined that the evidence clearly showed the benefits of adoption outweighed any detriment to H.G. caused by terminating the parent-child relationship. The court found that H.G. was adoptable, terminated parental rights, and ordered a permanent plan of adoption.

## DISCUSSION

### I

### *Introduction*

Mary and Simon contend the court's decision sustaining the factual allegations in the section 387 petition is not supported by substantial evidence. They argue the court erred when it did not consider the relative placement criteria under section 361.3. The parents also contend the court did not hold a required disposition hearing.

The Agency asserts that the parents lack standing to challenge H.G.'s removal from Grandparents' home. On the merits, the Agency maintains the court "essentially" considered the placement factors listed in section 361.3, and the court's findings and orders are supported by substantial evidence.

### II

### *The Parents Have Standing to Challenge the Court's Findings and Orders Under Section 387*

The Agency contends the parents were not aggrieved by the order removing H.G. from Grandparents' care and therefore they lack standing to raise this issue on appeal.

■ Generally, a parent who is an aggrieved party may appeal a judgment in a juvenile dependency matter. (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703 [97 Cal.Rptr.2d 88].) To be aggrieved, a party must have a legally cognizable interest that is injuriously affected by the court's decision. (*In re Carissa G.* (1999) 76 Cal.App.4th 731, 734 [90 Cal.Rptr.2d 561].) We liberally construe the issue of standing and resolve doubts in favor of the right to appeal. (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 540 [104 Cal.Rptr.2d 686].)

■ At the time of the section 387 hearing, Simon's and Mary's parental rights to H.G. had not been terminated. Although parent-child reunification was no longer a goal of the dependency proceedings, the parents retained a fundamental interest in H.G.'s companionship, custody, management and care. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 223 [33 Cal.Rptr.3d 337].) This principle is reflected in the language of section 361.3, subdivi-

sion (a)(2), which obligates the juvenile court to consider the wishes of the parent when determining whether relative placement is appropriate under section 387. (See also §§ 388 [allowing return to parental custody upon a showing of changed circumstances after reunification services are terminated], 366.21, subd. (h) [allowing parental visitation after termination of reunification services].)

In addition, a placement decision under section 387 has the potential to alter the court's determination of the child's best interests and the appropriate permanency plan for that child, and thus may affect a parent's interest in his or her legal status with respect to the child. (See, e.g., § 366.26, subd. (c)(1)(D); see also *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950–951 [124 Cal.Rptr.2d 688].) We therefore conclude that Simon and Mary have standing to challenge the trial court's findings and orders under section 387 on appeal.

III

A

*The Social Worker and the Court Must Evaluate Whether the Relative Placement Is Not Appropriate Under the Criteria in Section 361.3*

Mary and Simon contend the court erred when it sustained the section 387 petition and removed H.G. from her placement in the home of Grandparents. Mary and Simon contend there is insufficient evidence in the record to support the factual finding that Simon had unauthorized contact with H.G. in violation of the juvenile court order for supervised visitation. They argue the court did not determine whether the placement was not appropriate under section 361.3 and, had it done so, it would have been apparent that the placement was appropriate and H.G. should not have been removed.

When the Agency seeks to change the placement of a dependent child from relative care to a more restrictive placement, such as foster care, it must file a supplemental petition under section 387. A supplemental petition "shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3." (§ 387, subd. (b).)

Under section 387, the Agency has the burden to show by a preponderance of the evidence that the factual allegations alleged in the petition are true. If the court finds the factual allegations are true, then the court determines whether the previous disposition is no longer effective in protecting the child or whether placement with the relative is not appropriate in view of the criteria in section 361.3. (§ 387; *In re Miguel E.* (2004) 120 Cal.App.4th 521, 542 [15 Cal.Rptr.3d 530] (*Miguel E.*); Cal. Rules of Court, rule 1431(e)(1);[5] see *In re Javier G.* (2006) 137 Cal.App.4th 453, 460–461 [40 Cal.Rptr.3d 383].)

█ In determining whether the child's placement with a relative is appropriate, section 361.3, subdivision (a), directs the social worker and the court to consider, but not be limited to, all the following criteria:

"(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.

"(2) The wishes of the parent, the relative, and child, if appropriate.

"(3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.

"(4) Placement of siblings and half-siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002.

"(5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.

"(6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.

"(7) The ability of the relative to do the following:

"(A) Provide a safe, secure, and stable environment for the child.

"(B) Exercise proper and effective care and control of the child.

---

[5] Rule references are to the California Rules of Court.

"(C) Provide a home and the necessities of life for the child.

"(D) Protect the child from his or her parents.

"(E) Facilitate court-ordered reunification efforts with the parents.

"(F) Facilitate visitation with the child's other relatives.

"(G) Facilitate implementation of all elements of the case plan.

"(H) Provide legal permanence for the child if reunification fails. [¶] However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.

"(I) Arrange for appropriate and safe child care, as necessary.

"(8) The safety of the relative's home. For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309."[6]

■ If the court finds the previous disposition is no longer effective or the placement with the relative is not appropriate, then, in a separate disposition phase, the court must determine whether removal of the child from his or her placement is required. (Rule 1431(e)(2); *Miguel E.*, *supra*, 120 Cal.App.4th at p. 542; *In re Jonique W.* (1994) 26 Cal.App.4th 685, 691 [31 Cal.Rptr.2d 601].)

We review a decision to remove a child from a relative caretaker under the substantial evidence test. (*In re A.O.* (2004) 120 Cal.App.4th 1054, 1061 [16 Cal.Rptr.3d 117].) We review the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial

---

[6] For a relative to be considered appropriate to receive placement in the first instance, the relative's home must be approved according to the process and standards described in section 309, subdivision (d), which requires the Agency to conduct an in-home inspection regarding safety and the relative's ability to care for the child, and to check adult household members for criminal records and prior allegations of child abuse or neglect. (*Ibid.*) The approval of the relative's home is based on the standards set forth in regulations for family foster care licensing, which include standards of safety and sanitation for the home and standards for basic personal care, supervision, and services provided by the caregiver. (§ 309, subd. (d)(2); see *Miguel E.*, *supra*, 120 Cal.App.4th at pp. 541–542.)

court's findings. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415 [41 Cal.Rptr.3d 453].) The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.)

B

*The Factual Allegations in the Petition Are Supported by*
*Substantial Evidence*

In its section 387 petition, the Agency alleged: "On or about . . . January 17, 2005 [*sic*] to the present, the placement with the relatives was no longer appropriate in view of the criteria in [section] 361.3 in that: the relatives have allowed the child's father to . . . have unauthorized contact with the child in violation of the orders of the Juvenile Court."[7] The factual basis of the petition is the alleged unauthorized contact.

The court found that "the father visited that home or was in that home on certainly more than one occasion. But in light of the totality of the circumstances I believe that there was an unauthorized contact. It happened on more than one occasion, and it was in violation of the juvenile court orders."

We accept, as we must, the trial court's determination of the credibility of witnesses. (*In re S.C., supra,* 138 Cal.App.4th at p. 415.) Simon admitted he went to his brother's funeral and services and he saw H.G. on both occasions. He was in the home when the CASA called on January 17, 2006. The court also believed H.G.'s statement, reported by the social worker, that H.G. frequently saw her father in the home and she was "not supposed to tell."

We do not believe that, under the circumstances, Simon's presence at his brother's funeral and services can reasonably be interpreted as an unsupervised visit with H.G., in violation of juvenile court orders.[8] The juvenile court

---

[7] The court amended the section 387 petition by interlineation, striking an allegation that Grandparents allowed father to reside in the home. At the Agency's request, the court also amended the statement in the February 7, 2006 court report, "father stated that he was living there," to read, "[the CASA] was concerned that father was living in the home."

[8] The last order concerning visitation in the record was made at the detention hearing on October 3, 2005, following H.G.'s removal from her mother's custody. That order states: "Visitation between the child and MOTHER and FATHER shall be as follows: Supervised." In the detention report, the social worker stated: "the paternal grandmother was informed . . . that the father must contact me before visitation with the child. She was advised that the father is

did not issue a "no contact" order prohibiting all contact between Simon and H.G. There is no indication Simon's presence among family members and other mourners placed H.G. at risk of harm. However, H.G.'s statement that she frequently saw her father in the home constitutes sufficient evidence to support the court's determination that Simon was in the home on more than one occasion when H.G. was present. Although H.G. was not home when the CASA telephoned and spoke with Simon, the CASA's testimony corroborates the child's assertion that her father was in the home and supports the inference that such contact occurred after the funeral and services.

We conclude that the juvenile court's findings of fact are supported by substantial evidence. Under rule 1431(e)(1)(A), this is the first step the trial court must take when it considers whether a more restrictive placement is required. We now discuss the parents' contention that the court did not evaluate H.G.'s placement with Grandparents in view of all the criteria in section 361.3.

## C

### *The Court Did Not Consider Whether the Placement Was Not Appropriate for the Child in View of the Criteria in Section 361.3*

In *Miguel E.*, after discovering that the relative with whom the child was placed had a child welfare history, the Agency filed a petition under section 387 on the grounds that the Agency had rescinded its approval of the relative's home. This court concluded that, although the factual allegations of the petition were true, the fact that the Agency no longer approved the placement did not constitute substantial evidence that the previous disposition was not effective in protecting the child or that the placement was not appropriate under the criteria in section 361.3.[9] (*Miguel E., supra*, 120 Cal.App.4th at pp. 547–548.) "Whether the Agency approved Grandparents'

---

authorized by the court for supervised visits and must contact me before any such visits can occur." In a later report, the social worker stated she informed Grandmother on January 6, 2006, that neither H.G.'s father nor mother was allowed visits with H.G. unless supervised by the social worker.

[9] In 1997, as part of an omnibus bill that required the Agency to conduct criminal and child abuse background checks on prospective relative caretakers of dependent children, the Legislature amended section 387 to include the phrase "or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3." (Stats. 1997, ch. 793, § 28; see *Miguel E., supra*, at p. 541.) The Legislature added specific language for relative placement because the existing law did "not provide a clear statutory standard for removal of children from a relative foster care provider." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1196 (1997–1998 Reg. Sess.) June 17, 1997, pp. 1, 3.)

home (§ 361.3, subd. (a)(8)) was just one of the factors in section 361.3 the court could have considered." (*Id.* at p. 547.) The *Miguel E.* court disapproved the trial court's deference to the Agency instead of exercising its own discretion. (*Ibid.*) Thus, *Miguel E.* stands for the proposition that in considering all the criteria in section 361.3, the court must exercise its independent discretion when it determines whether a child's placement with relatives is not appropriate. (*Miguel E., supra,* at pp. 547–548; § 387.)

This case is similar to *Miguel E.* When the court determined Simon had unauthorized contact with H.G., it recognized that the contact occurred in the immediate aftermath of the death of a son and brother and that this was a mitigating circumstance. However, instead of assessing the statutory criteria in view of the circumstances of the case, the court stated, "the fact of the matter is we are at a .26 hearing at this point in time" and noted that the Agency has broad discretion to determine adoptive placements after a section 366.26 hearing.[10] The court's statement indicates that it did not exercise its independent judgment to consider whether the placement was not appropriate under the criteria in section 361.3. (§ 387; rule 1431(e); *Miguel E., supra,* 120 Cal.App.4th at p. 527; see, e.g., *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 [111 Cal.Rptr.2d 243].)

The Agency argues the court essentially considered the criteria in section 361.3 when it discussed the high standard for a child's care in relative placement. It also contends the Agency's detention report provides "[f]urther evidence the [section 361.3] criteria was considered." The detention report states: "Pursuant to [section] 361.3 the paternal grandparents are no longer appropriate for placement of this child as they placed the child at significant risk by allowing surreptitious unsupervised contact to occur with the father. The home is no longer a safe, secure and stable environment for the child. Moreover, the grandparents failed to protect the child from the parent by allowing the father unlimited access to the child in the home."

The Agency's detention report, rather than supporting the inference that the court considered the criteria in section 361.3, supports the opposite conclusion. The Agency asserted that Grandparents were no longer able to provide a safe, stable and secure environment for H.G. (§ 361.3, subd. (a)(7)(A)) and to

---

Thus the legislative history suggests that when the Agency seeks to remove a child from a placement with a relative, the court must evaluate the criteria under section 361.3.

[10] The Agency no longer has broad discretion to determine the child's adoptive family in all circumstances. (See § 366.26, subd. (n)(3)(B) [when the Agency seeks to remove a child from a prospective adoptive parent, the court determines whether the removal is in the child's best interests]; see also *In re Shirley K.* (2006) 140 Cal.App.4th 65, 72 [43 Cal.Rptr.3d 897].)

protect her from her parents (§ 361.3, subd. (a)(7)(D)). Nothing in the detention report suggests the Agency considered the other criteria listed in section 361.3, or other factors, as required by statute. (§ 361.3, subd. (a); see *Miguel E., supra,* 120 Cal.App.4th at pp. 547–548.)

The court's comments about the high quality of care required for dependent children were made in response to H.G.'s statement that Grandmother "smacked" her in the head when she refused to kiss her great-grandmother. However, there is nothing in the record to indicate that either grandparent physically disciplined H.G. on any other occasion, that child protective services investigated the incident, or that Grandparents had been responsible for any other act of child abuse or neglect. (See § 361.3, subd. (a)(5).) Although this incident raised concerns about Grandmother's exercise of proper and effective care and control of the child (§ 361.3, subd. (a)(7)(B)), this factor must be evaluated in view of all the criteria in section 361.3.[11] (§ 361.3, subd. (a).)

The Agency did not allege, nor did the court find, that any of the other criteria in section 361.3 had changed from the initial determination that Grandparents were appropriate custodians for H.G. Grandparents were of good moral character, they were willing to adopt H.G. in the event parental rights were terminated, they provided a home and the necessities of life for her, and they facilitated H.G.'s visitation with her extended family. (§ 361.3, subd. (a).) In view of H.G.'s diagnoses of posttraumatic stress disorder and reactive attachment disorder, a consideration of her special psychological and emotional needs was especially important. There is no indication the court considered H.G.'s exceptional needs, her wishes concerning placement and those of her parents and relatives, the stability of the placement, or the quality of the day-to-day care and education Grandparents provided. The Legislature has determined that *all* these factors are important in determining whether placement with a relative is not appropriate. (§§ 387, 361.3, subd. (a).)

In view of the success of H.G.'s placement with Grandparents before the events of January 2006 and the traumatic family circumstances during the time Simon's unauthorized contact with H.G. occurred, we conclude that the

[11] Other than the allegation Grandparents permitted unauthorized contact between Simon and H.G., there were no concerns expressed about her grandfather's ability to exercise proper and effective care of H.G.

court erred when it did not consider all the criteria in section 361.3. (*Miguel E., supra*, 120 Cal.App.4th at pp. 547–548.)

## D

### *The Court Is Required to Hold a Disposition Hearing When It Considers a Petition Under Section 387*

Mary and Simon contend the court did not hold a separate disposition hearing to determine whether H.G.'s removal from Grandparents' home was required. The Agency acknowledges that the court did not "specifically state it was removing H.G. from her grandparents," but asserts the court's implicit removal order is supported by substantial evidence.

Assuming arguendo the court properly determined the relative placement was not appropriate under section 361.3, we conclude that the court nevertheless erred when it did not hold a disposition hearing as required by rule 1431(e). Courts have long recognized the principle that the harm created by removing a child from his or her home may often "be more serious than the harm which the state intervention seeks to prevent." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 541 [184 Cal.Rptr. 778]; *Hansen v. Department of Social Services* (1987) 193 Cal.App.3d 283, 292 [238 Cal.Rptr. 232]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 822 [2 Cal.Rptr.2d 429]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1657 [54 Cal.Rptr.2d 722].) This principle is also reflected in section 387 and rule 1431(e).

Here, we cannot infer that the court conducted a disposition hearing. The court did not specifically state it was removing H.G. from Grandparents. Although the court order of April 13, 2006, is captioned "CONTESTED ADJUDICATION AND DISPOSITION," the court did not enter a dispositional finding or order under section 387. Instead, the court terminated parental rights and freed H.G. for adoption under section 366.26.

When a child needs continuity and stability, as here, the act of removal, and the manner in which it is effected, may have a long-term detrimental impact on a child's psychological and emotional health and well-being. As discussed, *ante*, H.G.'s diagnoses suggest that removal might place her at substantial risk of serious psychological and emotional harm. Multiple placements may lead to or exacerbate a diagnosis of reactive attachment disorder. (DSM-IV-TR, *supra*, at p. 128.) In addition to disrupting H.G.'s placement with Grandparents, in which she was doing well, the Agency's abrupt

removal required H.G. to change schools, lose contact with her extended family, interrupt her therapeutic process and terminate her relationship with her therapist.

In contrast to the immediate consequences of removal on H.G., the Agency did not identify the "significant risk" posed by Simon's "unauthorized contact" with H.G. in Grandparents' home.[12] Mere speculation is not sufficient to establish a risk of physical or emotional harm to a child. (*In re David M.* (2005) 134 Cal.App.4th 822, 830 [36 Cal.Rptr.3d 411]; see generally *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 [12 Cal.Rptr.3d 572]; *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1070 [62 Cal.Rptr.2d 281].) In addition, the Agency did not allege H.G. suffered any harm as a result of any unauthorized contact with her father. (See *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1203 [23 Cal.Rptr.2d 878] [there was insufficient proof of harm or danger of harm to support finding that prior disposition was ineffective in protecting the child].)

It is the court's responsibility to determine whether the child's removal from his or her home is required. (Rule 1431(e)(2).) We conclude that the court erred when it truncated the bifurcated procedure required by section 387 and rule 1431(e)(2). (*Miguel E.*, *supra*, 120 Cal.App.4th at p. 542; *In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 691.)

III

*The Challenges to the Court's Findings Under Section 366.26 Are Moot*

Because we reverse the order placing H.G. in a more restrictive level of care under section 387, we necessarily reverse the judgment terminating parental rights. Simon's and Mary's challenges to the finding of adoptability and Mary's contention the court erred when it determined the section 366.26, subdivision (c)(1)(A) exception did not apply to preclude termination of parental rights are therefore moot.

---

[12] The Agency did not allege in the section 387 petition that the "unauthorized" contact was "unsupervised" contact. We appreciate the risk to H.G.'s well-being were she left unsupervised in Simon's care; however, there is no substantial evidence to support a conclusion that Simon was alone with H.G. in Grandparents' home.

## DISPOSITION

The order removing H.G. from her placement with Grandparents under section 387 and the judgment terminating parental rights under section 366.26 are reversed. The juvenile court is directed to hold a new section 387 hearing in which it must consider all the criteria in section 361.3. If the court determines the relative placement is not appropriate, it shall conduct a disposition hearing to determine whether removal is required.

Benke, Acting P. J., and Huffman, J., concurred.