Filed 1/26/21  In re I.K. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| IN RE I.K. et al.,<br><br>Persons Coming Under The Juvenile Court Law.<br>_____,<br><br>SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>A.P.,<br><br>  Defendant and Appellant. | 2d Juv. No. B306402<br>(Super. Ct. No. 19JD-00062)<br>(San Luis Obispo County) |

A.P. (mother) appeals the juvenile court's order terminating her parental rights to her minor children I.K. and L.K. with a

permanent plan of adoption.  (Welf. & Inst. Code,[1] § 366.26.)
Mother also appeals the court's order removing the boys from
their relative placement with their parental grandfather Robert
K. (David)[2] and his wife Rebecca pursuant to section 387.  Mother
contends the court erred in removing the children from their
relative placement, and that this error also compels the reversal
of the order terminating parental rights.  We affirm.

### FACTS AND PROCEDURAL HISTORY
#### *Detention, Jurisdiction and Disposition*

Mother and Robert K., Jr. (father)[3] are the natural parents
of L.K., born in October 2016, and I.K., born in February 2019.
On February 22, 2019, the San Luis Obispo County Department
of Social Services (DSS) filed a section 300 petition alleging that
mother had tested positive for amphetamine, methamphetamine,
and opiates less than three weeks prior to I.K.'s birth.  Shortly
after I.K's birth, father tested positive for opiates,
methamphetamine, and THC.  Both parents have histories of
substance abuse.  As a result of mother's longstanding drug
problems, her parental rights to another child (J.P.) born in 2010
had been terminated less than a year prior to L.K.'s birth.

At the conclusion of the February 25, 2019 detention
hearing, I.K. and L.K. were ordered detained and were placed
with David and Rebecca at their residence in Paso Robles.
Mother and father were both awarded biweekly supervised visits.
At the conclusion of the May 8, 2019 jurisdiction and disposition

---

[1] All further statutory references are to the Welfare and
Institutions Code unless otherwise stated.

[2] Although the paternal grandfather's first name is Robert,
he is known and referred to as David.

[3] Father is not a party to this appeal.

2

hearing, mother was bypassed for reunification services due to her prior failure to reunify with J.P. Mother was told, however, that reunification services would be reinstated at the three-month interim review hearing if she participated in residential treatment and followed the recommendations from Drug and Alcohol Services. Reunification services were offered for father, who along with mother was set to begin residential treatment the following day in Tarzana. Both parents were awarded a monthly one-hour visit while they were outside San Luis Obispo County.

At the interim review hearing, the parties submitted the matter on DSS's report, which stated that neither parent had maintained sobriety during the three-month period. At the conclusion of the November 6, 2019 six-month review hearing, the juvenile court terminated reunification services for father and set the matter for a section 366.26 hearing on February 26, 2020.

### § 387 Supplemental Petition and § 388 Petitions; § 366.26 Report

On December 6, 2019, Rebecca went to the police station and reported that she had been assaulted by David. Rebecca reported that David became angry with her after she said "[f]uck" in front of the children. David asked her to stop swearing, but she continued doing so. David then threw two cups of water at Rebecca and grabbed her right wrist, causing a large bruise. Rebecca said there had been at least four prior incidents when David slapped or spit on her.

That same day, David was arrested at his residence for inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)). He was also served with an emergency protective order that prohibited him from entering the family residence. The police left I.K. and L.K. with David's niece and nephew, who lived in another residence on the same parcel of property.

3

David was released on bail the next morning.  He did not notify DSS of his arrest or the protective order.  He picked up I.K. and L.K. and took them to his mother Gale's house in Paso Robles.  On December 9, he took the children to L.K.'s appointment with occupational therapist Molly Bivens, who told David that he needed to inform DSS of his arrest and relocation of the children.  David did not do so.  Instead, he moved himself and the children into a motel in Paso Robles.

On December 11, 2019, social workers went to David and Rebecca's residence.  Rebecca reported that she did not know where David and the children were or where they were staying.  Rebecca also disclosed that throughout the dependency proceedings mother and father had been living in a separate dwelling on the same parcel of property where David and Rebecca lived.  The social worker had been told that mother and father were living with the maternal great-grandmother in Santa Maria.  David subsequently admitted that mother and father had been living on the property, even though the social worker had told him they were not allowed to be there.

Rebecca also told the social workers that although David and his family had pressured her to agree to an adoption, she "was never really on board with having [L.K. and I.K.] placed in their home."  Rebecca also did not like father and believed she was too old to be raising children.

The social workers also visited Gale that same day.  Gale admitted knowing where David and the children were staying, but refused to disclose that information because she feared DSS would remove the children from David.  Gale eventually agreed to call David on FaceTime while the social workers were present.  During his conversation with the social workers, David attempted to broker an agreement that the children would not be

4

removed from his custody if he revealed their whereabouts. After it became clear that no such agreement would be reached, appellant agreed to meet the social workers with the boys at the Oaks Motel in Paso Robles. I.K. and L.K. were detained and placed in foster care.

On December 13, 2019, DSS filed a supplemental petition to remove I.K. and L.K. from their relative placement with David and Rebecca pursuant to section 387. The petition alleged that "[David] and Rebecca K[.] have been the relative placement for [L.K. and I.K.]. On December 6, 2019, [David] was arrested for a domestic violence incident between him and his wife, Rebecca []. The minors were presented during the altercation. Law enforcement left the children in the care of [David's] nephew [T.B.], who resides next door to the family. Rebecca [] did not report this to the previous social worker until December 11, 2019. When [David] was released from jail, he proceeded to take the minors, and was unresponsive to [DSS] regarding the situation and the whereabouts of the minors."

In a February 13, 2020 addendum report, DSS stated "[DSS] is worried that if the children continue to reside in the home, they might continue to be exposed to domestic violence, or left without a caregiver due to [David] being arrested. There is also a concern that the biological parents will continue to be allowed access to the children outside the approved time. [DSS] has requested a Family Finding referral be done to see if there are any other available relatives with whom the boys can be placed. It appears that the relatives that [DSS] is aware of currently all reside on the same property, which has been problematic in the past. [¶] Due to [David's] recent criminal case, we are unable to place the children back in his care and are

5

currently recommending a reduction in visits in order to move toward a different permanent plan."

In its February 20, 2020 section 366.26 report, DSS recommended that mother and father's parental rights be terminated "so that [L.K.] and [I.K.] can be adopted when we find a home that is capable and willing to adopt them." DSS stated that "[t]he boys have been through a lot these past couple of months. It is disappointing that they had to be removed from family members they were accustomed to; however, they appear to be happy, sweet, and resilient children, and we are committed to finding them the best concurrent plan to meet their needs. Although we do not have a home selected yet due to looking and exhausting all family options, we will find an appropriate family for them."

In an April 14, 2020 addendum report, DSS documented its unsuccessful efforts to place I.K. and L.K. with another family member. As to David, DSS reported that "his criminal trial has been continued again, and we do not feel comfortable placing the boys back in his care. [David's] lack of transparency regarding the domestic violence incident and not being forthcoming about the location of the boys is concerning to [DSS], and we can no longer trust his intentions or reports where the boys are concerned." DSS added that it "has identified a permanent concurrent plan with a county licensed foster family, and it would like to move forward in transitioning the boys when the COVID-19 pandemic subsides."

Following numerous continuances, a combined section 366.26 hearing and jurisdictional and dispositional hearing on the section 387 petition were set to begin on June 3, 2020.

On June 2, 2020, mother and father each filed modification petitions under section 388 seeking reunification services based

6

on changed circumstances.  The evidence mother offered in support of her petition included proof that she had completed a parenting class and had recently enrolled in a methadone maintenance program with monthly randomized testing and weekly counseling.  The hearing on the petition was set to be heard in conjunction with the hearing on the section 387 petition and the section 366.26 petition.

### *The Combined Hearing and the Court's Rulings*

The combined hearing on the section 387 supplemental petition, the parents' section 388 petitions, and the section 366.36 selection and implementation was held on Zoom beginning on June 3.  The hearing was continued for further testimony on June 8, and again on June 10.

Gale, I.K. and L.K.'s 16-year old half-sibling A.K., and David's cousin M.U. testified that David had been the boys' primary caretaker, took care of all their needs, and did not have a bad temper.  David testified that he was bonded with the boys, attended to all their needs while they were in his care, and considered himself more of a father to them than a grandfather.  He claimed that he and Rebecca were getting a divorce and that the December 9th incident was the only time he and Rebecca had fought while the children were present.  He admitted throwing a cup of water at Rebecca while the children were present, but denied grabbing her arm or causing a bruise.  David also admitted that during most of 2019 mother and father were living in a separate dwelling unit on the same property.  When asked why he had not contacted DSS after his release from jail as directed by I.K.'s occupational therapist, David offered that he did not have access to the social worker's phone number because it was at his residence and he was not allowed to go there.

7

Social worker Jennifer Weissman testified that DSS was not recommending that the boys be placed for adoption with David or another family member. Weissman opined that David was unable to maintain boundaries between mother and father and the children and that service providers had reported their belief that the children were progressing better in their current placement.

Father testified to his belief that David had provided a safe, secure, and stable environment for I.K. and L.K. while they were in his care. He reported that he was receiving methadone treatment and had participated in individual counseling. He denied that he and mother had been living on the same parcel of property as David and the boys and claimed that he and mother had instead been living in Santa Maria. Mother testified that she had been clean and sober since April 12, 2020 and was participating in counseling. Both parents expressed their desire to have I.K. and L.K. placed with David.

At the conclusion of the combined hearing, the juvenile court denied mother and father's section 388 petitions based on its findings that neither parent had proved changed circumstances. On the section 366.26 petition, the court found that both children were likely to be adopted and terminated parental rights.

On the section 387 supplemental petition, the court found the factual allegations of the petition true by a preponderance of the evidence and concluded that the disposition sought by DSS was supported by both a preponderance of the evidence and clear and convincing evidence. The court recognized the strong emotional bond between the children and their extended family, but noted that "the love and affection and bonding that goes on in a family can also be a circle around which things that aren't so

8

hot are hidden."  The court concluded that although no particular incident was a "big deal," the cumulative effect of those incidents led the court to conclude that David was no longer a proper placement for the children.

Regarding the domestic violence incident, the court stated: "[W]e know from the research that domestic violence of any sort in the presence of children, and this was in the presence of children because, as it turns out, David's significant other was cursing in front of the children . . . , and that upset them . . . . [T]hrowing the water, maybe it wasn't like right in front of [the children] but, you know, kids don't need [it] to be right in front of them.  If they can hear something going on it's imprinting on them and it's not good."

The court also faulted David for his behavior after his release from jail.  The court noted that "the first thing that David should have done when he was released from custody was to call the social worker."  Instead of doing so, he picked up the children from his niece and nephew's house, took them to his mother Gale's house for a few days, then took the children and checked into a motel.  When DSS was finally able to make contact with David through Gale, "David said, well, if you're going to take the kids I'm not going to tell you where the kids are.  You're not going to tell the social worker where the children are?  So that's me, that's the judge who's responsible to know where the children are at all times. . . .  [T]he social workers are extensions of the court and to have that go on for as long as it did and not be reported."  The court accordingly granted the section 387 supplemental petition.  As to disposition, the court stated "I know the children have already been removed, but I will remove them from David and that will conclude my remarks."

9

**DISCUSSION**

Mother contends the juvenile court erred in granting DSS's section 387 supplemental petition to remove I.K. and L.K. from their placement with David and Rebecca.  DSS responds that mother lacks standing the challenge the court's removal order and that her claims in any event fail on the merits.  We agree with DSS on both points.

"Not every party has standing to appeal every appealable order.  Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal.  [Citations.]  An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).)  "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*Id.* at p. 238.)

In *K.C.*, *supra*, 52 Cal.4th 231, the juvenile court denied the grandparents' section 388 petition seeking the child's placement with them.  At the same hearing, the court terminated parental rights.  (*Id.* at pp. 234-235.)  The father asked the court to place the child with the grandparents, but did not "offer[ ] any argument against terminating . . . parental rights," i.e., he did not argue for the application of any of the exceptions to termination set forth in section 366.26, subdivision (b).  (*Id.* at p. 235.)

The father in *K.C.* filed a notice of appeal from the order denying the grandparents' section 388 petition and the judgment terminating parental rights.  (*K.C.*, *supra*, 52 Cal.4th at p. 235.)

10

The father did not contend the court erred by terminating his parental rights, that is, that any statutory exception applied. (*Id.* at pp. 234-237.) Rather, he "limited his argument to the question of K.C.'s placement and contended that, should the Court of Appeal reverse the placement order, the court should also reverse the judgment terminating parental rights to restore the parties to their prior positions. [Citations.] The Court of Appeal, reasoning that father was not aggrieved by the placement decision because it could not be shown to affect his parental rights, dismissed father's appeal." (*Id.* at p. 235.) In affirming, our Supreme Court stated that because the father did not contend the judgment "terminating his parental rights was improper in any respect[,] . . . he ha[d] no remaining, legally cognizable interest in K.C.'s affairs, including his placement . . . ." (*Id.* at p. 237.) The court concluded the father lacked "standing to appeal the order concerning placement" (*id.* at p. 234), and the fact he had joined in the grandparents' section 388 petition and actively litigated it did not change this result (*id.* at p. 239).

In so holding, the court distinguished *In re Esperanza C.* (2008) 165 Cal.App.4th 1042 (*Esperanza C.*), and *In re H.G.* (2006) 146 Cal.App.4th 1 (*H.G.*). In *Esperanza C.*, the mother filed a section 388 petition after the dispositional hearing, at which the court had set a section 366.26 hearing. (*Esperanza C.*, at pp. 1049-1050.) The section 388 petition sought placement with relatives and review of the child services agency's denial of a criminal records exemption for one of the relatives. (*Id.* at p. 1051.) The juvenile court denied the petition and the mother appealed. While the appeal was pending, the juvenile court terminated parental rights, and the court of appeal took judicial notice of that judgment. (*Id.* at pp. 1051-1052.) In response to the agency's claim that termination of parental rights had

11

rendered the appeal moot, mother argued that a reversal of the order denying the section 388 petition required reversal of the termination judgment in order to provide effective relief. (*Id.* at pp. 1054, 1061.)

The court of appeal rejected the mootness argument and concluded that reversal was required under the circumstances of the case so the juvenile court could exercise its independent judgment to consider the relatives for placement despite the criminal history. (*Esperanza C.*, *supra*, 165 Cal.App.4th at pp. 1061-1062.) The court reasoned that until the mother's parental rights were terminated she retained "a fundamental interest in . . . her child's companionship, custody, management and care" and "that placement of a child with a relative has the potential to alter the juvenile court's determination of the child's best interests and the appropriate permanency plan for that child, and may affect a parent's interest in his or her legal status with respect to the child." (*Id.* at pp. 1053-1054.)

In *H.G.*, *supra*, 146 Cal.App.4th 1, the parents appealed a section 387 order removing the child from the grandparents' care and also appealed the immediately ensuing termination of parental rights. (*Id.* at pp. 4, 8-9.) In reversing, the court of appeal determined that the juvenile court had failed to comply with sections 387 and 361.3. The court further found that the parents had standing because their parental rights had not been terminated when the section 387 order was issued and a section 387 placement decision could affect the decision to terminate parental rights, which the parents had separately challenged in both the juvenile court and on appeal. (*Id.* at pp. 9-10.)

*K.C.* compels us to conclude that mother lacks standing to challenge the order granting the section 387 supplemental petition. Reversal of that order would not advance any argument

mother made against the termination of her parental rights. Mother offered no such argument, and thus effectively acquiesced in the termination and "relinquished the only interest in [I.K. and L.K.] that could render [her] aggrieved by the juvenile court's order" removing the children from their placement with David and Rebecca. (*K.C.*, *supra*, 52 Cal.4th at p. 238.) Moreover, on appeal mother does not point to any error in the termination judgment. "'[T]he mere fact a parent takes a position on a matter at issue in a juvenile dependency case that affects his or her child does not alone constitute a sufficient reason to establish standing to challenge an adverse ruling on it.'" (*Id.* at p. 239.) Accordingly, mother lacks standing to challenge the section 387 order. (*Ibid.*)

Even if mother had standing, her claims fail on the merits. When a child services agency seeks to change the placement of a dependent child from relative care to a more restrictive placement such as foster care, it must file a supplemental petition under section 387. The petition "shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in [s]ection 361.3." (§ 387, subd. (b).)

During the adjudicatory phase of the hearing on a supplemental petition, the agency has the burden of proving the factual allegations of the petition by a preponderance of the evidence. (*H.G.*, *supra*, 146 Cal.App.4th at p. 11.) If the agency meets its burden of proof during the adjudicatory phase, the case proceeds to the dispositional phase in which the court determines whether the child needs to be removed from the current relative placement. (*Id.* at pp. 12, 17-18.) In doing so, the court "follows

13

the procedures for dispositional hearings to determine whether removal is appropriate." (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 542; Cal. Rules of Court, rule 5.565(e)(2).)  In the case of an existing relative placement, the determination whether to remove the child is based on the risk of harm to the child if he or she remained in that placement.  (*H.G.,* at p. 18.)  The agency has the burden of proof on that issue by a preponderance of the evidence. (*In re A.O.* (2004) 120 Cal.App.4th 1054, 1061.)

We review the juvenile court's findings at the adjudicatory and dispositional phases of the section 387 hearing for substantial evidence.  (*H.G.*, *supra*, 146 Cal.App.4th at pp. 12-14.)  "We review the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial court's findings.  [Citation.]  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]  The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order.  [Citation.]"  (*Id.* at pp. 12-13.)

Mother contends the evidence is insufficient to support the petition's factual allegations (1) that I.K. and L.K. "were present" during the domestic violence incident; and (2) that David was "unresponsive to [DSS]" regarding his arrest and the whereabouts of the children after his release from jail.  The record belies these contentions.  The children were plainly present when the domestic violence incident occurred.  Although mother focuses on whether the children were able to visually observe the incident, it is undisputed that they were present and that David was in the process of feeding them when the incident occurred.  As the juvenile court noted, the children could at the

14

very least hear what was happening and "if they can hear something going on it's imprinting on them and it's not good."

The record also amply supports the finding that David was "unresponsive" to DSS after his arrest. He took the children without telling DSS where he was going with them. When he was eventually contacted through his mother Gale, he initially refused to disclose the children's location unless DSS agreed not to remove them from his custody.

Mother next contends the juvenile court failed to consider the factors set forth in section 361.3[4] in issuing its ruling. Although the court did not expressly mention section 361.3 in its ruling, we must presume the court was aware of the law and properly carried out it duties. (*In re S.B.* (2009) 174 Cal.App.4th 808, 812-813.) Moreover, the reports and testimony at the

---

[4] These factors include the child's best interest; the wishes of the relative and child; placement of siblings in the same home; the good moral character of the relative and any other adult living in the home, including whether anyone residing in the home has been responsible for acts of child abuse or neglect; the nature and duration of the child/relative relationship; and the relative's desire to care for the child and provide permanency. (§ 361.3, subds. (a)(1)-(6).) The court also assesses the relative's ability to provide a safe, secure, and stable environment for the child; exercise proper and effective care and control of the child; provide a home and the necessities of life to the child; facilitate visitation with the child's other relatives; provide legal permanence; and arrange for appropriate and safe child care. (§ 361.3, subd. (a)(7)(A)-(I).) The court must also consider the safety of the relative's home. (§ 361.3, subd. (a)(8).) This includes an evaluation of the family's psychosocial history, which includes consideration of physical and mental health, substance abuse, violence, and experience caring for children. (§ 16519, subd. (c).)

section 387 hearing addressed the pertinent section 361.3 criteria, and counsel for DSS expressly referred to the statute in arguing that a change of placement was warranted.

Finally, appellant contends the court erred in failing to hold a dispositional hearing that was bifurcated from the jurisdictional hearing. But bifurcation in these circumstances is merely discretionary rather than mandatory. (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 542.) Because mother did not request a bifurcated hearing below, the issue is forfeited on appeal. (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P.J.

YEGAN, J.

16

Charles S. Crandall, Judge

Superior Court County of San Luis Obispo

_____

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Timothy McNulty, Deputy County Counsel, for Plaintiff and Respondent.