Filed 4/30/13  In re Luke P. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re LUKE P., a Person Coming Under the Juvenile Court Law. | B241731 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK84786) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Margaret S. Henry, Judge.  Pamela Tripp, Referee.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Plaintiff and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Emery El Habiby, Deputy County Counsel, for Defendant and Respondent.

_____

Appellant Jose P. (father) is the presumed father of Luke P., who was declared a person described by Welfare and Institutions Code section 300, subdivision (b) in January 2011.[1]  Father appeals from the April 6, 2012 order that Luke remain placed in an unrelated foster home, which reversed a prior order placing Luke with a paternal aunt in Mexico.  Father contends the dependency court did not have authority to reverse the prior order which had been made by a different judicial officer.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Luke and his seven siblings were brought to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in September 2010 by a referral alleging general neglect as well as emotional and physical abuse.  At the time, only one-year-old Luke, five-year-old twins Cristina and Luna and 11-year-old Carlos were living at home.  Luke, Cristina, Luna and Carlos were detained and placed locally with maternal aunt Maria G.[2] and a section 300 petition was filed.

On January 6, 2011, the dependency court sustained paragraphs B-1 (mother's substance abuse), B-2 (domestic violence), B-3 (father's substance abuse), and B-5 (inappropriate physical discipline by parents) of a third amended petition.  About a week later, DCFS filed a supplemental petition (§ 387) alleging that maternal aunt Maria G. was no longer able to care for the four children.  Pursuant to stipulation of all parties, the

---

[1]     All future undesignated statutory references are to the Welfare and Institutions Code.

[2]     The siblings were:  Jose (born in 1993); C. (1994); Carlos (1999); Emely (2000); Cristal (2003); twins Cristina and Luna (2005); and Luke (2009).  The original section 300 petition named just Carlos, Cristina, Luna and Luke because only these four children were living with mother.  Seventeen-year-old Jose and 16-year-old C. had run away from home just a few weeks before the referral to DCFS; 10-year-old Emely and 6-year-old Cristal were living with paternal aunt Maria P. in Mexico.  A section 602 petition had previously been sustained as to Jose, and he was in the custody of the probation department.  A protective warrant was issued for C.  Located about one year later, C. was placed first in foster care and then with the paternal aunt in Mexico.  Emely and Cristal returned to the United States and were placed with maternal aunt Erica G., who eventually became their legal guardian.

2

supplemental petition was dismissed and the children were placed with unrelated foster parents Mayra and Victor G.

By the July 2011 review hearing, the four children were doing well with Mayra and Victor G. Although paternal aunt Maria P. wanted to adopt the four children, the children did not want to live with her in Mexico. Speaking on behalf of his younger siblings, Carlos explained to the social worker that the only reason the paternal relatives wanted to adopt the children was to give mother and father unfettered access to them in Mexico. The children's therapist confirmed that they felt safe and loved with the foster family and did not want to be moved. Finding no reasonable probability that the children would return to mother or father's custody, the dependency court terminated reunification services for both parents. It found Carlos, Cristina, Luna, Luke (and Emely and Cristal) to be a sibling group and set the matter for a section 366.26 hearing (.26 hearing). Meanwhile, expressing its appreciation of the children's concerns about being placed in Mexico, the juvenile court ordered that they remain placed locally with Mayra and Victor G. and directed DCFS to arrange monitored visits for the children with the paternal relatives. The social worker was ordered to not discuss any change in placement with the children.

A few days after the hearing, Mayra G. told the social worker that she and Victor G. were interested in becoming legal guardians for Carlos, Cristina and Luna, but not Luke because, Mayra explained, they were too old to care for a child as young and active as Luke. However, maternal aunt Maria G. (with whom the children had been placed immediately after their detention) and the paternal aunt in Mexico both wanted to adopt Luke. Maria G. told the social worker that having all four children had been overwhelming, but she was confident that she would be able to care for just Luke if the other three children remained placed with Mayra and Victor G. DCFS initiated a home study of Maria G.

At the August 18 progress hearing, father requested an international home study of paternal aunt Maria P. who wanted to adopt six of the children. The children's counsel stated that, except for C., the children were "very distressed at the thought of being

3

moved, being displaced." Cautioning father that the children did not want to move to Mexico, the dependency court ordered DCFS to "look into it."

According to the report for the November 2011 .26 hearing, Carlos, Luna, Cristina and Luke continued to thrive in their placement with foster parents Mayra and Victor G. Mother and father had not contacted the children or DCFS. Luke was too young to express a preference but his older siblings still wanted no contact with the paternal relatives. Luke was having behavioral issues including "symptoms associated with a pervasive developmental disorder such as Autism." Although they wanted to be the legal guardians for Carlos, Luna and Cristina, Mayra and Victor G. felt they could no longer care for Luke. The dependency court ordered DCFS to proceed with legal guardianship for Carlos, Cristina and Luna in the home of Mayra and Victor G. Noting Luke's special needs, the court (Judge Margaret Henry) ordered DCFS to locate an appropriate foster home for Luke and continued the .26 hearing.

In a Last Minute Information for the Court filed for the continued .26 hearing on December 1, DCFS recommended legal guardianship with the paternal aunt in Mexico as the permanent placement plan for Luke. Following the hearing, the dependency court appointed Mayra and Victor G. legal guardians of Carlos, Cristina and Luna and continued the .26 hearing for a Regional Center assessment of Luke.

By the time of the continued hearing on January 5, 2012, Luke was doing well in his new placement with foster mother Carmen B. The Regional Center assessments had not been completed. Paternal aunt in Mexico still wanted to adopt Luke. At the hearing, father's counsel represented that "the issue with Luke, we were waiting to release him to the aunt in Mexico pending the Regional Center issue whether or not this child needs specific or special care prior to sending him to Mexico." The dependency court continued the .26 hearing to March 1 and ordered DCFS to include the Regional Center findings in a supplemental report and to begin the passport process for Luke.

Although Judge Henry had presided over most of the prior hearings, she was absent from the courtroom on March 1 when the matter was called by Referee Pamela Tripp. The parties stipulated Referee Tripp could preside over the continued .26 hearing.

4

Father took the position that Luke should be immediately placed with paternal aunt in Mexico based on the Regional Center findings that Luke was not eligible for services. DCFS did not want Luke sent to Mexico until he had a passport. Over DCFS objection, Referee Tripp ordered Luke released to paternal aunt in Mexico without a passport. Referee Tripp reasoned that Judge Henry had previously released C. to the same aunt without a passport and told DCFS to bring any problems with the placement to the court's attention.[3] The minute order states, "DCFS has discretion to walk the matter on calendar if there is a problem with the case."

On March 23, DCFS filed a walk-on petition seeking "further orders regarding placement of Luke with paternal aunt in Mexico." Luke in fact had not gone to Mexico. According to the petition, the social worker had been unable to contact the paternal aunt. Judge Henry had returned by that date and continued the matter to April 5 so that father's new counsel could be present. She ordered a supplemental report to "address and include an update on the status of a passport for [Luke]." Meanwhile, Luke was to remain placed with foster mother Carmen B.

In a Last Minute Information for the Court filed on April 5, DCFS stated that Luke's passport was expected sometime that month. DCFS also informed the court that Luke had bonded to Carmen B.; since being in her care, his mental and emotional state had improved considerably. DCFS expressed concern that Luke would regress if removed from Carmen B. and placed in Mexico with someone with whom he had no relationship. DCFS recommended a co-guardianship between Carmen B. and Mayra G. (Luke's previous foster mother and the legal guardian of Carlos, Cristina and Luna). On April 5, Judge Henry trailed the matter to the following day because of father's counsel's unavailability. Judge Henry stated: "I wasn't on the bench last time. I had never had any plan to have Luke move. So I need to hear from [father's counsel]."

---

**3**  County counsel explained to Referee Tripp that C. had been allowed to go to Mexico without a passport only because he was almost 17 years old and wanted to live with his aunt in Mexico and take his chances that his passport would arrive. Luke, by contrast, was an infant and could not make such a decision.

5

At the hearing on April 6, with father's counsel present, Judge Henry stated that she had not intended to send Luke to Mexico because of the sibling bond and because of the siblings' concerns that the paternal relatives would not protect the children from father. Over father's objection that Judge Henry did not have authority to reverse Referee Tripp's prior order, Judge Henry ordered Luke to remain placed with Carmen B. because of the strong sibling bond and because the court believed the paternal aunt would give father unmonitored access to Luke. The .26 hearing for Luke was continued to May 31.

In a Last Minute Information for the Court filed for the May 31 hearing, DCFS reported that the paternal aunt told the social worker that she now wished to pursue a co-legal guardianship with foster mother Carmen B. pursuant to which Luke would attend school in the United States and spend vacations and holidays in Mexico. DCFS recommended that co-guardianship be the permanent placement plan. At the hearing, father's counsel challenged DCFS's statement that father had unmonitored contact with Luke's brother, C., who was now living with the paternal aunt in Mexico. Counsel confirmed that paternal aunt would be willing to accept a co-guardianship, although adoption was still her first choice. Citing the need for additional information, the court continued the .26 hearing and ordered DCFS to prepare a supplemental report addressing whether father had contact with C. in Mexico; if so, whether such contacts were monitored; and the nature of father's relationship with the paternal aunt. That same day, father filed a timely appeal from Judge Henry's April 6 order.

## DISCUSSION

A.     *Father Has Standing*

DCFS contends father does not have standing to bring this appeal. It argues that, because father's reunification services had been terminated and he had virtually no contact with Luke during the dependency period, he lacks standing. We disagree.

6

Until parental rights are terminated, all parents have an interest in their children's companionship, care, custody and management. Although no longer paramount after reunification services have been terminated, that interest is still extant and the parent has standing to appeal pre-parental rights termination orders concerning the child's placement. (Compare *In re K.C.* (2011) 52 Cal.4th 231, 237 (*K.C.*) [father whose *parental rights had been terminated* did not have standing to appeal order denying paternal grandparents' request that child be placed with them], with *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 (*Esperanza C.*) [because relative placement has potential to alter dependency court's determination of permanent placement plan, mother whose reunification services have been terminated but whose parental rights have not been terminated has standing to appeal placement order]; see also *In re H.G.* (2006) 146 Cal.App.4th 1, 9-10 (*H.G.*) [same with respect to challenge to § 387 placement order].)

Here, father's reunification services had been terminated, but his parental rights had not. Under *K.C.*, *Esperanza C.* and *H.G.*, father had standing to challenge the order denying placement with paternal aunt. To the extent *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035 may be read to state a broad rule that a parent whose reunification services have been terminated has no standing to appeal subsequent orders, we respectfully decline to follow it.

B.    *The Dependency Court Had Authority to Modify the March 1 Placement Order*

Father contends it was error for Judge Henry to modify on her own motion Referee Tripp's March 1 order placing Luke with the paternal aunt in Mexico. He argues that the only procedural mechanism for challenging the March 1 order was (1) a section 252 petition for rehearing or (2) a section 388 petition for modification. Father is incorrect.

The general rule is that one judge cannot vacate an order made by another judge. (*In re Alberto* (2002) 102 Cal.App.4th 421, 427.) But this rule does not apply in dependency cases. " '[T]he objective of the dependency scheme is to protect abused or

7

neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.]' [Citation.]" (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 106 (*Nickolas F.*), citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) In *Nickolas F.*, the court recognized that this objective is furthered by section 385, which reads: "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article." (§ 385; see also Cal. Rules of Court, rule 5.560(a) ["Subject to the procedural requirements prescribed by this chapter, an order made by the court may at any time be changed, modified, or set aside."].) The only procedural requirement is prior notice. (§ 386.) The *Nickolas F.* court held that section 385 gives the dependency court authority to change, modify or set aside *any* order sua sponte. The authority to modify a previous order the court "independently recognizes as having been erroneously, inadvertently or improvidently made" is not contingent on a party seeking modification pursuant to section 388, nor is there any requirement of a showing of change of circumstances. (*Nickolas F.,* at p. 99.) In addition to statutory authority under section 385, the court in *Nickolas F.* recognized that the dependency court also has inherent authority under the California Constitution, article VI, section 1, "to reconsider its prior interim orders when necessary to prevent a miscarriage of justice, provided that in so doing, the court does not violate the constitutional rights of the parties." (*Nickolas F.,* at p. 99.)

Here, on March 23 Judge Henry gave the requisite notice to the parties of a possible change in the prior placement order when she set the matter for hearing on April 5. The court's expressed concern that the prior order left Luke vulnerable to father's unfettered access suggests that the court found the March 1 order was both improvidently granted and a miscarriage of justice in the absence of credible evidence that the paternal relatives in Mexico would protect Luke from father. Accordingly, under both section 385 and article VI, section 1 of the California Constitution, Judge Henry had

8

authority to modify Referee Tripp's prior order placing Luke with paternal aunt in Mexico.

To the extent father's argument that Referee Tripp's order was not erroneously, inadvertently or improvidently granted is a challenge to the sufficiency of the evidence to support the April 6 order, we find no merit in the argument. We review dependency court placement orders for abuse of discretion and challenged factual findings for substantial evidence. (*Nickolas F., supra,* 144 Cal.App.4th at p. 119.) The information that Luke's older siblings (except for C.) were afraid that the paternal relatives in Mexico would not protect them from father, along with the information that father may have had unmonitored contact with C. in Mexico, constituted substantial evidence to support Judge Henry's finding that the earlier placement order was improvidently granted.

## DISPOSITION

The April 6 order is affirmed.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

9