Filed 11/26/13  In re C.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.C. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.A.,<br><br>    Defendant and Appellant. | E056952<br><br>(Super.Ct.No. JUV75222)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Donna L. Crandall, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Dismissed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

## I. INTRODUCTION

After numerous failed placements, the juvenile court determined that minor C.C., born in 1999, was not a proper subject for adoption, and a planned permanent living arrangement with a foster family with a goal of adoption was her appropriate permanent plan. At the detention hearing on a supplemental petition under Welfare and Institutions Code[1] section 387, the juvenile court detained minor G.C., born in 2002, from father.[2] Although appellant A.A. (mother) purports to appeal from those orders, her only challenge is the failure of the court to order plaintiff Riverside County Department of Public Social Services (Department) to fully evaluate and assess the relative placement request of minors' half sister, A.C.[3] We conclude the issue is not yet ripe for appellate review.

## II. FACTS AND PROCEDURAL BACKGROUND

In February 2011, the Department filed petitions alleging that G.C. (then nine years old) and C.C. (then 11 years old) came within section 300, subdivisions (b) and (c). The petition alleged as to mother that she neglected G.C.'s mental health issues; failed to protect him from inappropriate discipline by a member of the household; abused controlled substances, including marijuana and methamphetamines; neglected the health and safety of the children; created a detrimental home environment because she suffered

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] The children's father is not a party to this appeal.

[3] Mother refers to the half sister as A.H.; however, she is identified in the record as A.C.

2

from unresolved mental health issues; and had failed to reunify with other children despite receiving reunification services. The petition further alleged that G.C. suffered from serious emotional damage, displayed violent outbursts, and had multiple psychiatric holds because of mother's failure to provide him with adequate mental health services.

The detention report stated that a Department social worker had responded to a referral after G.C. was observed to have red marks and bruising around his wrists. G.C. said his brother-in-law, J.C., who worked as a security guard, had handcuffed him at a family gathering until he settled down. The social worker found no indication of bruises on G.C.'s wrists, and G.C. said the bruises had disappeared. Red marks had been seen on his wrists three weeks earlier, and G.C. said he had been "put in shackles" during a game, but he did not elaborate.

C.C. told the social worker that G.C. had become "cranky due to not having had his medication yet," and he kicked J.C. "'where you're not supposed to.'" C.C. and her mother had been giving the children's niece a bath when G.C. began running around and screaming, and J.C. had put the handcuffs on him for about five minutes until he calmed down. C.C. and mother stated the family had used handcuffs on G.C. about three times in the past when they had to transport him to Riverside County Department of Mental Health Emergency Treatment Services (ETS).

G.C.'s teacher told the social worker that the children were often late to school, and they said it was because mother did not "wake up in time." The teacher reported that G.C. had been getting counseling services but had been dropped from the program

3

because of poor attendance. G.C. was on medications for ADHD, depression, and oppositional defiant disorder.

Mother told the social worker she had a hard time controlling G.C.; he had rages and threatened to hurt himself and others. He was taking medication at night to help him sleep and was also taking Depakote, but it was making him aggressive and violent, and he had threatened to hurt himself and others. She had called the police several times for help, and ETS would not take him because he was too young. The children's father had been out of the home since July 2010. Father had been abusive to mother and to G.C., and G.C.'s behavior had been getting better since father left. Mother reported she had bipolar disorder, but she was not taking any medication. She admitted smoking marijuana but denied using other drugs. A saliva drug test was positive for marijuana and inconclusive for amphetamines.

The social worker visited the family home and observed that it was dark and smelled of mold and dampness. The living room ceiling was leaking, and the ceiling panels were falling and appeared to be rotting. The children's beds were in a family room that had food and trash strewn about, and their beds had no sheets. In a follow-up visit, the social worker observed that the rotting ceiling panels had been removed and covered with plastic, and the children's bedroom area was more organized. Mother tested positive for marijuana and methamphetamine in a urine test.

The social worker spoke with A.C., the children's adult half sister and J.C.'s wife. A.C. reported that J.C. put handcuffs on G.C. after trying to restrain him when he "'flip[ped] out,'" threw things, and punched J.C. and kicked him in the private area. The

4

handcuffs had been left on for less than five minutes, during which time G.C. had calmed down. J.C. had used the handcuffs to keep G.C. from hurting himself and others in the home. J.C. gave the same version of the events.

In a follow-up visit, mother became agitated and made comments about taking the children to Arizona so Child Protective Services (CPS) would stay out of her life. She said she did not trust CPS and did not want to work with the agency. In another follow-up visit, the social worker observed that food and clothing were again strewn on the floor, and there was a bucket in the living room to catch water leaking from the ceiling. Mother acted angry and agitated, and she commented that the Department had "d[one] her wrong" by removing two older children years earlier even though she had done everything asked of her.

The social worker took the children into protective custody. They reported there had been no heat in the house and that mother did not get up in the morning. The family had an extensive history of contacts with the Department. Mother requested that the children be placed with A.C. and J.C., but J.C. was being investigated for suspected child abuse of G.C. The juvenile court detained the children and ordered services for parents.

The Department filed a jurisdiction/disposition report in March 2011. The report stated that two of the children's adult half siblings had been declared dependents in 1991. Mother had failed to reunify with the two half siblings, and they had remained in dependency until they reached the age of majority. A third half sibling had remained in mother's care until he reached the age of majority.

C.C. told the social worker that both she and G.C. had been diagnosed with ADHD, but neither was on medication. C.C. stated she had frequent migraine headaches. She had been in counseling in the past, but mother had "'stopped it.'" C.C. denied substance abuse in the home, although mother occasionally drank alcohol to celebrate without becoming drunk. C.C. also denied physical discipline in the home.

G.C. told the social worker he was not in counseling because mother did not want people to come to the house. He had difficulty sitting still during the interview. He said he had been diagnosed with ADHD and "had tried every kind of medication," but now took medication only to help him sleep.

Mother again requested that the children be placed with their half sister, A.C., and her husband, J.C. The social worker again reported that J.C. was being investigated for suspected child abuse based on the handcuffing incident. A.C. visited the children with mother and appeared parental and nurturing with them. The maternal grandmother in Arizona and paternal grandmother in Minnesota also expressed interest in relative placement.

The Department filed an addendum report in April 2011. G.C. had been separated from C.C. because of physical aggression toward her and had been placed in a different foster home. The foster family also requested removal of C.C. from their home, and she had been placed in a new foster home. The children were determined to be eligible for membership with the White Earth Band of Chippewa, of which father was an enrolled member. The tribe intervened in the case under the Indian Child Welfare Act (ICWA).

6

The Department reported that a home evaluation had been completed for A.C., and "the assessment [wa]s still pending CLETS results." A.C. continued to visit the children with mother.

At the jurisdiction hearing, the juvenile court found the allegations of the petition true as amended. The court ordered the Department to commence proceedings under the Interstate Compact on the Placement of Children (ICPC) with the states of Nebraska (where father resided), Minnesota (where the paternal grandmother resided), and Arizona (where the maternal grandmother resided).

The Department filed a second addendum report in May 2011. The children remained in separate placements. C.C.'s caregiver had declined placement of G.C., because G.C. had acted aggressively toward C.C. during supervised visits, and the caregiver could not assure C.C.'s safety if the children were placed together. G.C. continued to act disruptively in school and aggressively toward others, and his foster family submitted notice to end the placement. C.C. had adjusted positively to her foster family. The children had undergone psychological assessments. The psychologist reported that G.C. hit C.C. and cut her lip when they were residing in the same foster home. The psychologist concluded both children were experiencing depression and anxiety and both needed long-term counseling; in addition, G.C. had symptoms of ADHD. The psychologist recommended that the children be reunited.

Although ICPC evaluations were pending as to father and both grandmothers in other states, Mother stated she would prefer that the children remain in California in the care of A.C. The Department did not report on the CLETS results as to A.C.; however,

7

the social worker stated, "There are serious concerns regarding the safety of children in [A.C.'s] home as her spouse [J.C.] handcuffed [G.C.] in order to manage his behavior." It does not appear that the incident ever resulted in any criminal charges against J.C.

At the disposition hearing, the juvenile court found good cause to deviate from the placement preferences under ICWA. The court explained, "First of all, it is the request of the mother of the children, who has been the primary caretaker, that I do deviate from the preference. And although I appreciate that one parent is an Indian parent and the other parent is not, I believe that the non Indian parent does have some standing with this Court to indicate her preference, and I am considering that preference. [¶] In addition, I have heard from the Indian children, one of which is nine, the other of which is 11, both indicating that they do not want to be placed with the grandparent that they do not know at this particular time. [¶] Finally, there is no available Indian home for the children to be placed with right now because we do not have a completed ICPC." The tribal counsel stated to the court, "Your Honor, I believe the law is clear that any relative is considered a first-tier placement preference." The juvenile court ordered reunification services for parents.

The Department filed a six-month review report in November 2011. The children had been placed in a foster home together, but the foster parents had requested termination in September because the children were aggressive toward each other and toward other children in the home. A second foster family requested termination in October because the children were physically aggressive, refused to attend school, refused to help with chores, and constantly yelled and cursed. Both children had been in

8

individual counseling, which had stopped when they switched foster families. ICPC evaluations of the maternal grandmother in Arizona and of father in Nebraska had been approved, and an ICPC evaluation of the paternal grandmother in Minnesota was pending. The children told the social worker they would like to be placed with their maternal grandmother. C.C. would also like to be placed with father, but G.C. did not want to be placed with father.

At the review hearing, the juvenile court continued reunification services and authorized the Department to place the children with father in Nebraska.

In April 2012, the Department filed a detention report under section 387. The report stated C.C. had been removed from father's home in Nebraska and had been placed in a confidential foster home. Father had contacted the social worker and said he was no longer able to care for the children because they were out of control, constantly fighting, yelling, throwing things at each other, and being disrespectful toward him. C.C. had put father's girlfriend's son in a chokehold when the son tried to separate G.C. and C.C. during a physical altercation. Father said the children had several times put at risk the safety of other children in the home. Father later agreed to keep G.C. in the home and to get him appropriate services. Mother again requested placement of the children with A.C. or the maternal grandmother.

At the detention hearing on the section 387 petition, the juvenile court found a prima facie case and detained C.C. as to father. The court found that an able, assessed, and willing relative was not available for C.C.'s placement, but stated, "This is a temporary finding and does not preclude later placement with a relative under W&IC

9

361.3." The court ordered ICPC proceedings as to the maternal grandmother in Arizona and authorized placement with her once ICPC approved.

On April 16, 2012, A.C. was referred to the relative assessment unit for placement of C.C. However, on May 2, A.C. withdrew her referral for possible placement of C.C. with her.

The Department filed a jurisdiction/disposition report as to the section 387 petition in May 2012. C.C. told the social worker that her problems in father's home were because father would not leave her alone and give her space. She did not want to return to father's care because he treated her "differently" than other children in the home.

The Department filed a 12-month status report in May 2012. G.C. remained with father in Nebraska, and C.C. was placed in a foster home. Father reported that G.C. was no longer acting out and was getting along well with other children in the home. Mother visited C.C. regularly since C.C.'s return to California, and A.C. supervised the visits. C.C. stated she wished to be placed with her maternal grandmother in Arizona. An expert witness for the children's tribe filed a declaration on June 7, 2012, stating that C.C.'s placement in a licensed foster family home did not meet placement preferences under ICWA. The declaration further stated it was the witness's understanding there were relatives to consider for placement and recommended that "the [D]epartment continue[] to search for relative placement and/or a Native American home to place [C.C.]"

The Department filed an addendum report in July 2012. The maternal grandmother withdrew from the home study program in Arizona, and as a result, the

ICPC referral was denied. G.C. remained with father in Nebraska, and C.C. remained in foster care. A delivered service log attached to the report indicated that on June 19, A.C. had again been referred to the relative assessment unit.

At the review hearing on July 19, 2012, the juvenile court again found good cause to deviate from the ICWA placement preferences. The court terminated reunification services as to father for C.C. and continued G.C. in father's custody under family maintenance. The court terminated reunification services for mother as to both children. The court found that C.C. was not a proper subject for adoption, and a planned permanent living arrangement with a foster family with a goal of adoption was her appropriate permanent plan. Mother filed a notice of appeal from that order.

In August 2012, the Department filed a section 387 petition as to G.C. after father informed the Department he was no longer able to care for G.C. because of G.C.'s aggressive and uncontrollable behavior. The section 387 detention report stated father did not wish to have any type of contact with G.C. The report stated that mother had requested that G.C. be placed with A.C. but that J.C. "was investigated by the Department for suspected child abuse" involving G.C.

At the detention hearing on the section 387 petition, the juvenile court found a prima facie case and detained G.C. from father.

### III. DISCUSSION

**A. Standing**

The Department contends mother lacks standing to appeal the denial of relative placement.

11

"'[T]o have standing to appeal, a person generally must be both a party of record and sufficiently "aggrieved" by the judgment or order.' [Citation.]" (*In re Daniel M.* (2003) 110 Cal.App.4th 703, 709.) In *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053-1054, the court held that a mother had standing to challenge a juvenile court order regarding placement decisions. The court explained: "Until parental rights are terminated, a parent retains a fundamental interest in his or her child's companionship, custody, management and care. [Citations.] At the time of the proceedings at issue here, [the mother's] parental rights had not been terminated. This court has also recognized that placement of a child with a relative has the potential to alter the juvenile court's determination of the child's best interests and the appropriate permanency plan for that child, and may affect a parent's interest in his or her legal status with respect to the child. [Citations.] While an alternative permanency plan to adoption may be unlikely on this record, it remains a statutory option for the juvenile court. We resolve doubts in favor of [the mother's] right to appeal. [Citation.]" (See also *In re H.G.* (2006) 146 Cal.App.4th 1, 10 [parent had standing to challenge an order removing minor from relative placement].)

In the present case, mother's parental rights have not been terminated; indeed, the juvenile court has determined that C.C.[4] is not a suitable candidate for adoption and

---

[4] At the time of the July 19 hearing, G.C. was with father and not in need of a new placement.

12

therefore no hearing was set under section 366.26.[5] Based on the cases cited above, we conclude mother has standing to raise the issue of relative placement.

## B. Forfeiture

The Department next contends mother has forfeited the relative placement issue because she failed to raise the issue in the juvenile court. However, mother repeatedly raised the issue with the social worker. We conclude the issue has not been forfeited.

## C. Relative Placement

"(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 351, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." (§ 361.3, subd. (a).) "For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309." (§ 361.3, subd. (a)(8).) "If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied." (§ 361.3, subd. (e).) Relative placement is also given priority in ICWA cases (§ 361.31, subd. (b)(1)) so long as it complies with "prevailing social and cultural standards of the Indian community." (§ 361.31, subd. (f).)

---

[5] A different rule applies after a parent's rights have been terminated: "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 238.) This is not such a case.

13

Here, although A.C. had earlier requested assessment as a caregiver for the children, she withdrew her request in May 2012. She was again referred to the relative assessment unit on June 19. The record does not indicate whether that referral, only one month before the hearing on review, had yet been finalized. The orders appealed from do not address that issue. Because the assessment was still pending at the time of the hearing, we conclude the issue is not ripe for appellate review.

## IV. DISPOSITION

Appeal dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

J.

We concur:


RAMIREZ

P.J.

KING

J.