Filed 6/5/14  In re M.L. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.L. et al., Persons Coming Under the Juvenile Court Law. | B249177<br><br>(Los Angeles County<br>Super. Ct. No. CK60426) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>M.L.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Marguerite Downing, Judge.  Reversed.

Lori A. Fields, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel for Plaintiff and Appellant.

\* \* \* \* \* \*

1

In separate appeals, the Los Angeles County Department of Children and Family Services (the department) and minor, M. L., challenge an April 12, 2013 juvenile court order dismissing, before adjudicating, a contested Welfare and Institutions Code[1] section 387 petition.  We reverse.

<h3 style="text-align:center">FACTS AND PROCEDURAL BACKGROUND</h3>

**Detention, Jurisdiction and Guardianship**

The department filed the section 387 petition after M.L. made allegations that her legal guardian, maternal uncle, David E., Jr. (David) had sexually abused her multiple times over a four-year period.  The department also filed a section 388 petition to terminate the guardianship by David and his spouse Guadalupe E. over M.L., who was 16 years old, and three of her younger siblings: sisters (14-year-old S. L. and 13-year-old P. L.) and brother (10-year-old, L. L., Jr., hereafter L.L. Jr.).

M.L. and three of her younger siblings initially came to the juvenile court's attention on September 6, 2005, when the department filed a section 300 petition on their behalf.  The children were removed from their parents' custody and placed in two separate foster homes after the department received two referrals in 2005 alleging their mother, V.E. (Mother), abused drugs.  The initial referral, which was made on June 15, 2005, was closed during the investigation after Mother fled with the children.  Mother attempted to flee after a second referral was made on August 24, 2005.  However, the department located Mother and children with assistance from law enforcement officers.  Mother and children had been living in the home of maternal grandfather, David E., Sr.  Mother had a long history of using drugs and admitted using crystal methamphetamine but denied recent drug use.  However, Mother tested positive for amphetamines and methamphetamines on August 26, 2005.  Mother stated that she believed maternal grandfather was innocent even though there were two separate convictions.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Mother reported that the children's father, L.L., Sr. (Father), was incarcerated in Solano State Prison, with an expected release in 2008. Father had an extensive criminal history between 1984 and 2002 including 16 convictions for among other things, drugs, possession and use, battery of a peace officer, theft, driving under the influence of drugs and alcohol, inflicting corporal injury on a spouse/cohabitant and carrying a loaded firearm in a public place.

On September 29, 2005, the department stated in an addendum report that Mother admitted knowing that the maternal grandfather was a registered sex offender. The maternal grandfather was twice convicted of indecent exposure and had to register as a sex offender in 1975 and 1991. Mother stated that she believed maternal grandfather was innocent even though there were two separate convictions.

The juvenile court sustained the section 300 petition on September 29, 2005. As amended, the petition alleged Mother had a history of substance abuse. Mother tested positive for amphetamine and methamphetamine on August 26, 2005. Mother's abuse of illicit drugs endangered and placed at risk the children's physical and emotional health and safety and created a detrimental home environment. Father had an unresolved history of substance abuse including illicit drugs and alcohol, which endangered and placed at risk the children's physical and emotional health and safety. The juvenile court declared the children dependents and ordered them to remain in Mother's custody but ordered Mother not to live with maternal grandfather. Mother was given family maintenance services. Mother was ordered to participate in individual counseling, parenting, drug counseling and random drug testing. Father did not receive reunification services due to the length of his incarceration.

On December 20, 2005, the department filed a section 342 petition alleging the children were at risk. The section 342 petition alleged Mother had failed to: provide the children with adequate food and shelter; cooperate with the department; make the children available to the department; participate in court-ordered programs; ensure the children attended school; and obtain necessary medical care for treatment of children's chronic head lice. It was also alleged Mother allowed seven-year-old S.L. to walk home

3

alone.  The juvenile court found a prima facie case to detain the children at the detention hearing on December 20, 2005.  Mother was given monitored visits and family reunification services.  The four children were placed in a foster home.

On January 19, 2006, the department filed a first amended section 342 petition. As sustained and amended, the section 342 petition alleged Mother had failed to: cooperate with the department; make the children available to the department; provide the children with adequate food and shelter; participate in court-ordered programs; ensure the children attended school; and obtain necessary medical care for treatment of children's chronic head lice.  Mother had sexual intercourse with her companion, Hector, in the children's presence.  Mother and Hector had physical fights in front of the children. Mother left the children alone with Hector, who called them bad names and cursed at them.  The juvenile court ordered the children removed from Mother's custody.  Mother was given reunification services and monitored visits.

The juvenile court conducted a section 366.21, subdivision (e) six-month review hearing on July 20, 2006.  The department reported that between August 2005 and March 2006, the children were placed in four foster homes.  The children were all in the same foster home in July 2006.  Mother was not participating in court ordered programs which included drug testing.  Mother visited the children regularly but she was often late. Father remained incarcerated.  The department recommended Mother's reunification services be terminated and the matter be set for a permanent plan hearing pursuant to section 366.26.  The juvenile court found Mother in partial compliance and continued reunification services.

A 12-month status review hearing was set for January 18, 2007.  The department reported the children were residing with maternal uncle, Oscar E,. and his spouse, Patricia E.  Mother's whereabouts were unknown to the department since the July 2006 hearing.  Mother had been arrested and incarcerated.  Mother's visits were sporadic and when she did visit she was chronically late.  Mother was not in compliance with the case plan.  The department recommended that her reunification services be terminated and that

4

a permanent plan hearing be set. The juvenile court continued the matter for a contested hearing on February 27, 2007.

On February 14, 2007, the department filed a section 387 petition on behalf of the children which alleged that Oscar E. and Patricia E. engaged in domestic violence in front of the children. S.L. and P.L. reported to their therapist that Patricia spanked them and L.L. Jr. with a belt. Patricia slapped P.L. in the face. Oscar E. wanted the children removed from his home because they could not continue caring for the children. The children were removed from placement and placed in two separate foster homes on February 9, 2007.

On February 27, 2007, the juvenile court terminated Mother's reunification services and set the matter for a section 366.26 hearing on June 26, 2007. The proposed permanent plan was identified as adoption.

On March 15, 2007, the juvenile court sustained allegations in the February 14, 2007 section 342 petition that Patricia E. had inappropriately disciplined S.L. and P.L. by striking them and that the maternal uncle, Oscar E., had failed to protect the children. The children were ordered removed from their care.

The section 366.26 hearing was continued a number of times to allow the department to locate an adoptive home for the children. In September 2007, the department identified maternal uncle David, and his wife, Guadalupe, as prospective adoptive parents.

Mother was incarcerated twice in 2007 from July through October. In November 2007, Mother filed a section 388 petition requesting that she receive her court-ordered weekly visits and three calls a week. Also in November 2007, David and his wife, Guadalupe, filed separate section 388 petitions requesting placement of the children in their home. On January 18, 2008, the juvenile court granted all three petitions in part including giving David and Guadalupe overnight visits. Mother was given the relief she requested. However, Mother was ordered not to go to the home of David and Guadalupe while the children were present. By March 5, 2008, all four of the children had been

5

placed in the home of David and Guadalupe. On June 6, 2008, an adoption home study was approved for David and Guadalupe.

The department reported for the July 23, 2008 section 366.26 hearing that David and Guadalupe were committed to adopting the children and recommended that parental rights be terminated. However, the juvenile court chose guardianship as the permanent plan and terminated jurisdiction on April 17, 2009.

**Mother and Father's Post-Termination Petitions**

After the guardianship was established, Mother and Father (who had been released from prison on parole in December 2008) filed a number of section 388 petitions. Mother and Father had another child, Melody L., in November 2009. They were living in the home of Oscar and Patricia, who had custody of the children before they were removed from that placement because of a domestic violence incident and Patricia's inappropriate discipline of the children.

In January 2010, Mother and Father filed separate section 388 petitions requesting resumed jurisdiction, reinstatement of reunification services and unmonitored visits.[2] The juvenile court resumed jurisdiction and calendared hearings on the section 388 petitions on June 14, 2010. The juvenile court denied the section 388 petitions and again terminated jurisdiction.

On September 17, 2010, Mother and Father filed separate section 388 petitions requesting unmonitored visits. The juvenile court summarily denied these section 388 petitions.

**Resumption of Jurisdiction in 2012 and Multiple Section 388 Petitions**

On March 15, 2012, Mother and Father filed separate section 388 petitions requesting that the juvenile court return S.L., P.L and L.L. Jr. to their custody or in the alternative allow unmonitored visits. However, neither parent requested a change of order for M.L. in their petitions. In an interview on May 30, 2012, M.L. reported that Mother kicked her out of the visits in September 2011. She had not seen Mother and

---

[2]    Father was never given reunification services because of his incarceration.

Father since then.  M.L. wanted to leave early to go to a football game.  Mother told M.L., "'Don't come to the fucking visits next time.  Don't be messing up my visits with everyone else.'"  M.L. became extremely emotional during the interview and began crying when asked about Mother and Father's decision not to include her in their petitions.

In a May 30, 2012 interview, maternal uncle David reported that Mother was currently incarcerated for threatening him and his wife.  Mother got angry because he ended a visit early when Mother began yelling at L.L. Jr.  In the children's presence, Mother threatened to have the couple killed.  When Father called the children on the telephone, they would say Father was "drunk again."

The children each expressed strong desires to be adopted by their guardians.  They also wanted fewer visits with the parents.  One child stated, "it felt like a 'chore' to visit the parents."

On June 14, 2012, the children's attorney filed a section 388 petition requesting the juvenile court to schedule a section 366.26 hearing to allow their guardians to adopt them.  The court held a hearing on all three section 388 petitions on July 3, 2013.  The court denied Mother and Father's petitions.  The court resumed jurisdiction and set the matter for a section 366.26 hearing.

A month later, Mother and Father filed separate section 388 petitions requesting reinstatement of reunification services and termination of the guardianship.  The petitions, which were directed to all four of the children, were set for hearing on August 31, 2012.  The matter was continued after the children's counsel informed the court of a conflict of interest in representing M.L.  After new counsel was appointed to represent M.L., the court heard and denied the parents' section 388 petitions and ordered them to appear for the section 366.26 hearing on October 30, 2012.

**The Section 387 Petition Alleging David Sexually Abused M.L.**

On October 24, 2012, the department filed a section 387 petition on behalf of the children alleging they were at risk of harm because maternal uncle, David, sexually abused M.L. and Guadalupe failed to protect her.   The petition alleged that, over the past

four years, the maternal uncle sexually abused M.L. by removing her clothing, fondling and digitally penetrating her vagina, orally copulating her, forcing her to orally copulate his penis, sucking her breasts and watching her shower. It was further alleged that Guadalupe knew that M.L. was being sexually abused and failed to protect her by allowing the maternal uncle unlimited access to M.L.

The department reported that the children were taken into custody and placed in separate foster homes: M.L. and S.L. were in one home and P.L. and L.L. Jr. were in another home. Because of the alleged sexual abuse, the department was also investigating abuse of the two minor children of David and Guadalupe, a 17-year-old daughter, D.E., and a 10-year-old son. D.E. also had a four-month-old daughter. David agreed to move out of the family home and not to have unmonitored contact with his children and grandchild.

On October 19, 2012, the department received a referral from M.L.'s school counselor about a letter M.L. had written documenting alleged sexual abuse by David. M.L. told the social worker she wrote the letter and showed it to the school counselor because she did not want to wait until the section 366.26 hearing which was scheduled for October 30, 2012.

M.L. also told the social worker that David would enter her bedroom at night while everyone else in the home was asleep. He did this for the first time about four years ago. At that time, he removed the blankets off her, pulled down her pants and put his finger in her vagina. The second time he came into her bedroom, he pulled her shirt down, sucked her breasts and placed his finger in her vagina.

M.L. then changed the subject and told the social worker she did not want to be adopted because her guardians had threatened to terminate Mother's visits. M.L. also stated that the guardians treated her and her siblings differently from their own children. L.L. Jr. had to ask before drinking water, eating or taking a bath. S.L. took showers only three time a week. She and all her siblings had to use a bucket because they were not allowed to use the showerhead or shower every day. M.L. reported that David drank three packs of 24-ounce beers every day. Guadalupe started fights with M.L. and her

siblings. A few years prior to the interview, Guadalupe shook L.L. Jr. by the back of his shirt until he gagged. M.L. stated that the guardians forced them to tell the department that she and her siblings were happy living with the guardians.

When the social worker asked M.L. what Mother wanted, M.L. responded that Mother did not want the proposed adoption to proceed. The social worker noted that M.L. kept looking at a cell phone during the interview, which M.L. indicated belonged to Mother, who was letting her use it.

The social worker redirected the interview to the sexual abuse issue. M.L. reported that it stopped when she was in the eighth grade; however, at that time, David tried to put his penis in her mouth. M.L. provided similar information to a police detective when he arrived to interview her. She reported that there were eight incidents of sexual abuse. She wrote about the abuse in her journal and showed it to Guadalupe, who asked to take the journal. When Guadalupe gave it back to M.L., the pages containing the sexual abuse entries had been removed. Guadalupe told M.L. that "'[h]e didn't do this.'"

M.L. told the detective that David put his finger in her vagina and made in and out movements. He also licked her vagina. While he was doing these things, she would close her eyes and move her body to stop him. Once he tried to get in bed with her so she moved her body away from him. Nine family members shared one bathroom in the home. On three occasions, when she was showering, David entered the bathroom and opened the shower curtain. He claimed he thought Guadalupe was in the shower. The last shower incident occurred in February or March 2012.

When 14-year-old S.L. was interviewed by the social worker, she reported that about a week before, M.L. stated that "'my tio touched me.'" She also remembered hearing M.L. scream about a year earlier and later earned that David had entered the bathroom and opened the shower curtain. S.L. denied that David had ever touched her in a way she did not like. However, once when Guadalupe was not home, he told S.L. that he would give her $5 if she would "put on a blindfold and suck something." S.L. refused and walked away. She did not tell anyone about the incident she described as

9

"disgusting." She reported an incident when David entered her bedroom and stood by P.L.'s bed, "just looking at her." S.L. said David drank two or three cans of beer three times a day and more on the weekends.

Although they did not physically abuse them, S.L. said the guardians treated her and her siblings differently than their biological children. When they first lived with them, Guadalupe would take L.L. Jr. into a room and throw sandals at him. S.L. did not want to go back to their home; rather, she wanted to be in a foster home preferably with maternal aunt, Cynthia E. (Cindy). S.L. visited with Mother about once a week and believed Mother and Father were doing better with the drug problems that caused their children to be in foster care.

Twelve-year-old, P.L. denied being sexually abused by David. She thought David, who gave her candy, was nicer than Guadalupe, who made her use a bucket to shower because "they take too long." P.L. denied that anyone drank beer in their home. P.L. reported that they were not treated equally in the home and she did not want to return to them. M.L. said if they did not like the home, they could leave and M.L. would "back [her] up." P.L. said, "[Y]eah, I'll do it" meaning she would "listen" to M.L.

P.L. said that when Guadalupe was mad, they were "given standards to write words from the dictionary." However, Guadalupe did not punish M.L. by making her write standards because she "is scared of [M.L.]." P.L. reported that the night before the department removed them from their guardians' home, M.L. and S.L. argued with Guadalupe and Daisy over where S.L. should do her homework. Guadalupe asked S.L. to do her homework by the light at the kitchen table but S.L. wanted to work on the floor. M.L. called Guadalupe the "b word," which angered D.E., who then began arguing with M.L. After D.E. and M.L said bad words to each other, M.L. and S.L. left and went to Mother's home after she picked them up. P.L. thought that when the social worker came to the home she would be going to Cindy's home because M.L. told her that Cindy would take the children into her home.

When asked by the social worker if he saw or heard of his sisters being touched, 10-year-old L.L. Jr. asked, "'Like if anyone's raping them? Doing bad things when they

are drunk?'" He did not want to explain what he meant by "bad things" but said that he did not know of any bad things happening to his sisters. He denied he had been sexually abused. He confirmed P.L.'s account of the argument between M.L., S.L., Guadalupe and D.E. He also confirmed that M.L. and S.L went with Mother after the arguments. He stated Guadalupe treated him differently than she treated her biological son. He cited as an example she would not give L.L. Jr. medicine if he had an earache but would give the biological son medicine if he had a headache. L.L. Jr. said he did not like being yelled at in the guardians' home and felt like a normal child in the foster home. He denied anyone used drugs or alcohol in the home.

The guardian's biological children denied being sexually abused. D.E. reported that her father drank six beers at parties. D.E. also said M.L. and S.L. had been acting differently since the last court date. S.L. was disrespectful to her guardians. On the night of the argument about the homework, after Guadalupe instructed S.L. to do the homework at the kitchen table, M.L. said, "'They're fucking annoying.'"

The department reported that M.L. was "very clear" about the sexual abuse and S.L had disclosed that David "proposed a suspicious solicitation for $5.00." All four children said they did not want to return to the guardians' home where they were not treated equally. There was an indication that M.L. and S.L. were having unauthorized contact with Mother. The disruptions in the guardians' home became more significant after September 25, 2012, when M.L. and S.L. began visiting Mother and Father. Prior to that time, the children appeared to have developed relationships with their caregivers and inquired about being adopted. P.L. and L.L. Jr. continued to refuse to visit their parents. While noting that M.L. and P.L.'s visitation with Mother may have triggered the disclosures, the risk for future abuse was high so the children should be removed from the guardians' home.

At the October 24, 2012 section 387 detention hearing, the juvenile court found a prima court a prima facie case for detaining the children from the guardians' custody. The matter was set for pretrial resolution conference and a jurisdiction hearing.

11

In a status review report dated October 30, 2012, the department reported that M.L.'s sexual abuse allegations had been substantiated.

Between July and September 2012, when the social worker made unannounced home visits to the guardians' home, the children appeared happy and at ease. The children reported they were happy and treated well in the home where they wanted to remain. During the same period of time, all four children refused to visit their biological parents. M.L. and S.L. began visiting their biological parents on September 25, 2012. But, P.L. and L.L. Jr. continued to refuse to visit their parents.

The department reported that, during a home visit on October 1, 2012, M.L., S.L., and P.L. reported that the guardians treated them unfairly and they did not want the guardians to adopt them. M.L. said they had to do chores while the biological children did not have to do any. She could not have an IPOD or a Facebook account while the biological children could. S.L. said D.E. was allowed to use a laptop all the time that Mother gave S.L.; but, S.L. could not use it that much. P.L. said she felt like she was being treated differently but when asked to give an example, she said, "'I don't know. It's just different.'"

The guardians reported that M.L. and S.L.'s behavior changed "drastically" after they began visiting their parents. They told the guardians they did not have to listen to them or do chores. They stopped talking to the guardians. On October 7, 2012, M.L. and S.L. left the home without permission and without saying where they were going. They came back at 10:00 p.m., and when asked where they had been, they did not answer and went to their room. A similar incident occurred several days later. David said that everything started after M.L. spent time with her parents after court on September 25, 2012, and came home with a really expensive purse. He felt Mother was "very tricky" and was manipulating the children by making promises to them.

The juvenile court took the section 366.26 hearing off calendar on October 30, 2012. In separate interviews on November 8, 2012, M.L. and S.L. repeated statements they had made about sexual abuse and other issues in the guardians' home. When M.L. was questioned about why her current statements were so different than past statements,

she replied that she had been listening to "what the guardians were telling her." This is what she wanted now. When asked for clarification, she reported that she and her siblings would be told to disclose that they did not want to visit with Mother or Father and that they wanted to be adopted. When S.L. was questioned, she said that Mother had told M.L. that there was a chance that they could be placed with maternal aunt Cindy. Prior to that, she and her siblings did not know where they would be placed if they were removed from their guardians' home.

P.L. said that the guardians told them what to say to the social worker. L.L. Jr. said he wanted to live with Mother because he missed her. The guardians forced him to write a letter on August 23, 2012, because they hated his parents. If he did not lie, he would have been in trouble. He was "forced not to" visit Mother and Father even though he wanted to see them.

In a November 13, 2012 interview, Guadalupe admitted M.L. showed her a letter stating that M.L. had been sexually abused by David. Guadalupe inquired why M.L. would make such a "strong" and "false" allegation; however, M.L. responded that the allegations were true. Guadalupe questioned David when he arrived home. He was shocked and denied the allegations. Guadalupe indicated that the allegations arose after M.L. had unauthorized contact with Mother. Guadalupe denied she told the children what to say to social workers; rather, she told them to tell the truth.

David "adamantly denied sexually abusing" M.L. or touching her in any way that could be perceived as sexual abuse. He thought the allegations were the result of Mother's manipulation.

On November 20, 2012, Detective McCormick of the Los Angeles County Sheriff's Department informed the department that David submitted to and failed a polygraph test. Detective McCormick stated, "'Something definitely happened'" as David passed all other questions posed to him except whether he had ever touched M.L. in a sexual manner. The test "spiked" on that question. Detective McCormick had three separate deputies, who administer the tests, review the results and the impression was unanimous that David failed the polygraph.

13

The department recommended that the juvenile court sustain the section 387 petition. In a last minute information dated December 5, 2012, the department reported that the District Attorney had rejected a criminal case against David. On December 13, 2012, the department placed the children with maternal aunt Cindy.

On December 28, 2012, the department filed a section 388 petition requesting the juvenile court terminate the guardianship and suitably place the children. The court granted a hearing on the section 388 petition. The court subsequently continued hearings on the section 387 and section 388 petitions on February 26, 2013 "due to court congestion," on March 11, 2013, because M.L.'s counsel was ill and on April 11, 2013, because M.L.'s counsel was engaged in trial in a different courtroom.

On April 12, 2013, the juvenile court began the hearing on the contested section 387 petition and the section 388 petition. M.L. testified in chambers that she began living with David and Guadalupe when she was in the sixth grade. Within less than a year, David began touching her inappropriately. The first time was between 1:00 a.m. and 2:00 a.m. when he entered the bedroom she shared with S.L., P.L. and D.E. M.L. was sleeping on a bottom bunk bed when she was awakened by David as he pulled down the blanket that was covering her. He pulled down her shirt, started to suck her breasts for about five minutes and then left. She did not respond to David because she was shocked. She did not tell anyone about the abuse because was afraid she and her siblings would be separated again.

The second incident occurred about a month later when David entered the bedroom in the middle of the night. He sucked her breasts after pulling her tank-top shirt down and touched her vagina after pulling her pajama bottoms and underwear down to her knees. She tried to turn away to the wall but he continued to try to do it. The third incident occurred the same way as the second incident. M.L. did not say anything about the incidents because she was afraid of being removed from the home. David sexually abused her eight times and all the incidents occurred in the bedroom.

Besides the sexual abuse, M.L. testified that when Guadalupe went to the store, David entered the bathroom three times while she was taking a shower and pulled the

14

curtain to see her. M.L. locked the door when she showered but David opened it with a key.

The first person she told about the sexual abuse was her friend, Ricky, in January 2012, who told her to tell someone. In September 2012, M.L. told her friend Blanca and S.L. about the abuse. M.L. did not tell an adult about the abuse until October 2012, when she told Guadalupe, who responded that M.L. was lying. The juvenile court noted for the record that M.L. had been tearful throughout her testimony.

In October 2012, M.L. told her high school counselor about the sexual abuse because, after she confided in S.L., S.L. said she woke up one night and saw David in P.L.'s bed.[3] M.L. denied that her accusations were motivated by a desire to live with her biological parents. She admitted that she lied to the department when she said she wanted the guardians to adopt her and her siblings and did not want to visit Mother and Father. Rather, the guardians forced her to say Mother and Father were holding her back from moving on and that Mother was "just drama." The guardians forced her to report that she was doing well and deny that there was any abuse in their home. M.L. reported the sexual abuse after she had unmonitored contact with Mother on September 25, 2012. After that visit, Mother gave M.L. a Coach bag as a gift because M.L. needed a new bag.

After David's attorney completed cross-examination of M.L., the juvenile court announced that it had to start an adjudication of a different case after lunch. In the afternoon session, the court announced that there was "a trial balancing issue because we have a matter that is to be given priority." The court indicated that it was granting the section 388 petition and dismissing the section 387 petition as the previous disposition was not effective in protecting the children. The court then reinstated jurisdiction, gave the department discretion to suitably place the children and set a section 366.26 hearing.

M.L.'s counsel objected to the dismissal of the section 387 petition absent agreement of all the parties. M.L.'s counsel's objections were joined by all counsel (the department, M.L.'s siblings, Mother, Father, Guadalupe and David). In overruling the

---

**3** The juvenile court struck this testimony after sustaining its own hearsay objection.

objections, the juvenile court stated that once the legal guardianship was terminated the court had jurisdiction under section 300. There was no need to conduct a lengthy trial to reinstate what it already had. The court further stated that the section 387 petition is used to indicate replacement, which had already happened. There was no need to continue because the court had jurisdiction "and make any appropriate findings." The court found that having a trial would be an ineffective use of the court's time under Evidence Code section 352. The court then granted the section 388 petition terminating the guardianship and dismissed the section 387 petition. These timely appeals followed.

## DISCUSSION

### I. Standard of Review and Applicable Statutes and Rules

Appellants contend the juvenile court lacked authority to dismiss the section 387 petition without adjudicating it. We review de novo the legal question of whether the court acted without authority in dismissing the petition. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2008) 162 Cal.App.4th 1408, 1414.)

Section 387 provides in part: "(a) *An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition.* [¶] (b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3. . . [¶] (d) Upon the filing of the supplemental petition, the clerk of the juvenile court shall immediately set the same for hearing within 30 days, and the social worker shall cause notice thereof to be served upon the persons and in the manner prescribed by Sections 290.1 and 291. [¶] (e) An order for the detention of the child pending adjudication of the petition may be made only after a hearing is conducted pursuant to Article 7 (commencing with Section 305)." (Emphasis added.)

16

California Rules of Court,[4] rule 5.565 provides in part: "**(a) Contents of subsequent and supplemental petitions (§§ 342, 364, 387)** [¶] A subsequent petition and a supplemental petition must be verified and, to the extent known to the petitioner, contain the information required in an original petition as described in rule 5.524. A supplemental petition must also contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the protection of the child or, in the case of a dependent child placed with a relative, that the placement is not appropriate in view of the criteria in section 361.3. [¶] **(b) Setting the hearing (§§ 334, 342, 364, 386, 387)** [¶] When a subsequent or supplemental petition is filed, the clerk must immediately set it for hearing within 30 days of the filing date. The hearing must begin within the time limits prescribed for jurisdiction hearings on original petitions under rule 5.670. [¶] **(c) Notice of hearing (§§ 290.1, 290.2, 292, 297)** [¶] For petitions filed under sections 342 or 387, notice must be provided in accordance with sections 290.1, 290.2, and 291. Notice for petitions filed under section 364 must be provided as stated in section 292.[¶] **(d) Initial hearing (§ 387)** [¶] Chapter 12, article 1 of these rules applies to the case of a child who is the subject of a supplemental or subsequent petition. [¶] **(e) Requirement for bifurcated hearing** [¶] *The hearing on a subsequent or supplemental petition must be conducted as follows:* [¶] *(1) The procedures relating to jurisdiction hearings prescribed in chapter 12, article 2 apply to the determination of the allegations of a subsequent or supplemental petition. At the conclusion of the hearing on a subsequent petition the court must make a finding that the allegations of the petition are or are not true. At the conclusion of the hearing on a supplemental petition the court must make findings that:* [¶] *(A) The factual allegations are or are not true; and* [¶] *(B) The allegation that the previous disposition has not been effective is or is not true.* [¶] *(2) [¶] The procedures relating to disposition hearings prescribed in chapter 12, article 3 apply to the determination of disposition on a subsequent or supplemental petition. If the court finds under a subsequent petition that the child is described by*

---

**4**      All references to rules are to the California Rules of Court.

*section 300(a), (d), or (e), the court must remove the child from the physical custody of the parent or guardian, if removal was not ordered under the previous disposition.*" (Emphasis added.)

## II. Dismissal of the Section 387 Petition

As previously noted, rather than adjudicating the section 387 petition, the juvenile court relied on section 388 to terminate the guardianship and place the children into foster care. However, the statutes are procedurally different and cannot be interchanged in the manner chosen by the court.

Section 388 may generally be applied to terminate a guardianship if the proposed change is in the child's best interests. (§ 388, subd. (a); *In re Jessica C.* (2007) 151 Cal.App.4th 474, 480.) By contrast, section 387 is a specific statute containing a detailed procedure, which applies when the order will remove the child from the physical custody of a parent, guardian or relative and place the child in foster care. (*In re Jessica, C.*, *supra*, 151 Cal.App.4th at p. 480.) Thus, a section 387 petition applies when termination of the guardianship will result in a foster care placement. (*Ibid*; *In re Carlos E.* (2005) 129 Cal.App.4th 1408, 1419, fn. 5.)

In this case, the section 387 petition was made after the juvenile court had established a guardianship as the permanent plan in 2009. The section 387 petition sought to remove the children from their guardians' home and place them in foster care. The paramount consideration in the post permanency stage is to provide a stable permanent home for the children. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "Consequently, the decision to remove a dependent child from the home of a relative caretaker who has assumed the role of de facto parent for several years cannot be made lightly. 'This is particularly true where, as here, the removal decision is made in the post-permanency planning stage of dependency proceedings in which it has been determined that reunification of a dependent child and his or her parents is no longer possible.' [Citation.]" (*In re Jessica C., supra,* 151 Cal.App.4th 474, 481-482 quoting *In re Jonique W.* (1994) 26 Cal.App.4th 685, 695.)

18

Because of these considerations, section 387 mandates a bifurcated hearing consisting of a jurisdictional or adjudicatory phase followed by a dispositional phase. (*In re A.O.* (2010) 185 Cal.App.4th 103, 110; *In re H.G.* (2006) 146 Cal.App.4th 1, 12, 17-18.) In the first phase, the juvenile court is required to follow the jurisdictional procedures of a section 300 hearing. (Rule 5.565(e)(1); *In re Javier G.* (2005) 130 Cal.App.4th 1195, 1200; *In re Jonique W., supra,* 26 Cal.App.4th at p. 691.) In the jurisdictional phase, the court *must* determine whether the factual allegations are true and whether the previous disposition has been ineffective to protect the child. (Rule 5.565(e)(1); *In re A.O., supra*, 185 Cal.App.4th at p. 110; *In re Jessica C., supra*, 151 Cal.App.4th at p. 481.)

If the jurisdictional facts are established, the juvenile court is required to make an appropriate disposition in the second phase. The juvenile court must follow the procedures related to dispositional hearings on the original section 300 petition. (Rule 5.565(e)(2); *In re H.G., supra,* 146 Cal.App.4th at p. 18; *In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 691.) The court is required to find by clear and convincing evidence there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being and no alternative reasonable means to protect the child exists. (§ 361, subd. (c)(1); *In re Javier G., supra*, 130 Cal.App.4th at pp. 1200-1201.)

Thus, section 387 and rule 5.565 mandate that the juvenile court conduct a bifurcated hearing to find the allegations true or untrue and to make a disposition of a child, who is removed from the guardian's home and placed into foster care. Despite such mandate, the juvenile court made no jurisdictional findings and did not hold a disposition hearing but instead summarily dismissed the section 387 petition. It was error to do so because a bifurcated trial is required.

Furthermore, the juvenile court erred in concluding the section 387 petition was no longer necessary because the children had already been replaced and it had jurisdiction under section 300. The court cited Evidence Code section 352 and its congested calendar as the bases for summarily dismissing the section 387 petition. However, as shown below, there is no authority for the procedure adopted by the juvenile court in this case.

19

No doubt once the guardianship was established, the juvenile court retained jurisdiction of the children under sections 366.3 and 366.4. However, nothing in those sections or in Evidence Code section 352 allow a juvenile court to "truncate" the adjudicatory and dispositional responsibilities mandated by section 387 and rule 5.565(e). (*In re H.G., supra*, 146 Cal.App.4th at p. 18; *In re Jonique Q., supra*, 26 Cal.App.4th at p. 691.)

Moreover, a court's broad inherent powers to ensure the orderly administration of justice do not allow the court to proceed in a manner which is inconsistent with or contravenes a statute. (*Los Angeles County Dept. of Children and Family Services v. Superior Court, supra*, 162 Cal.App.4th at pp. 1419-1420.) Indeed, section 350 allows the juvenile court to control the proceedings and dismiss a petition at any hearing upon its own motion. However, section 350, subdivision (c) specifies that the dismissal motion follow the presentation of and the weighing of evidence and a determination that the department has failed to meet its burden of proof.[5]

---

[5]    Section 350 provides in this regard: "(a)(1) The judge of the juvenile court shall control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought. Except where there is a contested issue of fact or law, the proceedings shall be conducted in an informal nonadversary atmosphere with a view to obtaining the maximum cooperation of the minor upon whose behalf the petition is brought and all persons interested in his or her welfare with any provisions that the court may make for the disposition and care of the minor. [¶]….[¶]…[¶ (c) *At any hearing in which the probation department bears the burden of proof, after the presentation of evidence on behalf of the probation department and the minor has been closed, the court, on motion of the minor, parent, or guardian, or on its own motion, shall order whatever action the law requires of it if the court, upon weighing all of the evidence then before it, finds that the burden of proof has not been met. That action includes, but is not limited to, the dismissal of the petition and release of the minor at a jurisdictional hearing, the return of the minor at an out-of-home review held prior to the permanency planning hearing, or the termination of jurisdiction at an in-home review. If the motion is not granted, the parent or guardian may offer evidence without first having reserved that right.*" (Emphasis added.)

20

Furthermore, before dismissing a dependency petition, the juvenile court should consider whether the dismissal will compromise the child's welfare or is in the interests of justice. (See *Taylor M. v. Superior Court* (2003) 106 Cal.App.4th 97, 105-107; *Allen M. v. Superior Court* (1992) 6 Cal.App.4th 1069, 1071-1072.) Here, the juvenile court dismissed a dependency petition over all the parties' objections including the department and M.L. and without consideration of whether the dismissal compromised the children's welfare or was in the interests of justice. Even when the dismissal is sua sponte, the juvenile court is still required "to ensure that the dismissal does not compromise the child's welfare or the interests of justice." (*Taylor M. v. Superior Court, supra,* 106 Cal.App.4th at p. 106 & fn. 12.)

Moreover, a summary dismissal is not harmless when it is inconsistent with the juvenile court's duty to protect the children's welfare and to act in the interests of justice. (Compare *Taylor M. v. Superior Court, supra,* 106 Cal.App.4th at p. 107 [error in denying an evidentiary hearing before dismissing a dependency petition over child's objection was not harmless] with *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1077-1078 [it was harmless error to dismiss a dependency petition on agency's motion over child's objection where the court admitted the reports and many witnesses were examined in a full evidentiary hearing].) In this case, the parents' rights have not been terminated. David is mother's brother. Mother has a history of relying on her maternal relatives for shelter. Mother sought shelter from the department by fleeing with the children to live with maternal grandfather, who was twice convicted of crimes which required him to register as a sex offender. Mother and Father, who have a new baby, are living in the home of maternal relatives, who previously had a section 387 sustained against them after allegations of domestic violence and inappropriate discipline were made. The juvenile court's summary dismissal of the section 387 petition occurred in the middle of M.L.'s testimony of sexual abuse by a maternal uncle. The dismissal without adjudication of pertinent issues such as the children's "current and future welfare" was error. (§ 350, subd. (a).)

21

The juvenile court's failure to adjudicate the section 387 petition as mandated by statute was erroneous.  Accordingly, the dismissal order must be reversed.[6]

**DISPOSITION**

The juvenile court order dismissing the section 387 petition is reversed.  The juvenile court is directed to conduct a section 387 hearing.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. [*]

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

CHAVEZ

---

[6]     Because we have concluded the juvenile court proceeded in an authorized manner, we need not address M.L.'s constitutional claims.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.