Filed 1/14/22  In re N.D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re N.D., a Person Coming Under the Juvenile Law. | B311099 |
| _____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.F.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP04990A) |

APPEAL from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

A.F. (Father) appeals from dependency court jurisdiction and disposition orders concerning his newborn son N.D. The court initially removed N.D. from his mother (Mother) because of her drug abuse and mental illness, and the court gave custody of N.D. to Father. We primarily consider whether substantial evidence supports the juvenile court's later finding that Father disobeyed the removal order by returning N.D. to Mother's care without authorization—which the court found required a further order removing N.D. from Father's care too.

I

A

Mother and N.D. tested positive for amphetamine and methamphetamine when N.D. was born. Mother admitted she used methamphetamine four months into her pregnancy (which is when, according to her, she found out she was pregnant); Mother claimed she stopped using at that time, but she had no explanation for the positive drug test. Mother also revealed she had previously been diagnosed with mental health problems, including posttraumatic stress disorder and attention deficit hyperactivity disorder. The Los Angeles County Department of Children and Family Services (the Department) was alerted to the positive drug test results.

The following day, the Department contacted Father as part of its investigation into N.D.'s welfare. He worked as a truck driver, which meant that he was often away from home on the road. Father claimed he was unaware of Mother's drug use and he said he was unconcerned about leaving newborn N.D. in Mother's care. When N.D. was ready for discharge from the hospital and the Department obtained an order removing him

from Mother's custody, Father told a Department social worker that he wanted N.D. placed with the child's paternal grandparents.

The Department filed a dependency petition asking the juvenile court to assume jurisdiction over N.D. based on Mother's drug abuse and mental and emotional problems. At the initial detention hearing in late September 2020, the court detained N.D. from Mother and released the child into Father's custody, with conditions. The court permitted visitation between N.D. and Mother, but only with a Department-approved monitor present for the visits.

At a later jurisdiction hearing, the juvenile court sustained the dependency petition allegations against Mother. (Failure to protect allegations that were included in the petition as against Father were stricken by the court.) The court continued its prior placement orders in effect: custody of N.D. to Father with only monitored visitation for Mother. The court denied Father's request to terminate dependency court jurisdiction.

B

Later, on December 17, 2020, Mother called the Department and said Father left N.D. with her some four days earlier and had been unreachable. Explaining, Mother told the Department that she agreed to give Father a ride to the airport. When she arrived, Father unexpectedly brought N.D. with him and, after they all stopped at an apartment building at Father's request, Father left the car and never returned (Mother drove

away with N.D. after waiting for over an hour).[1]  Mother later called the paternal grandparents and asked if they knew where Father was, but they did not.  The paternal grandparents were also unwilling to take in N.D. when Mother tried to give the baby to them.

The day after Mother called the Department, Father showed up at the home where Mother was staying with N.D.; a Department social worker was also at the residence at the time.  In response to questions from the social worker, Father admitted he left N.D. with Mother unmonitored and said he had no explanation for why he was not able to make alternative childcare arrangements.  Father said he was traveling to the airport to travel to a job interview in Wisconsin and missed his flight at the airport, which was scheduled to depart at 7:30 a.m.  Father claimed he was inside the apartment building where he got out of the car (to "'handle[] business'"; he would not elaborate) for only "a short time" and Mother was gone when he came back outside.  When asked why he left N.D. with Mother unsupervised for so long, Father had no answer.  When asked what his plans were for N.D., Father said he did not have a plan and added he wanted a DNA test because he did not " 'believe this baby [N.D.] is mine anyway.'"

In response to Father leaving N.D. in Mother's care without a monitor in violation of the juvenile court's order, the Department filed subsequent and supplemental dependency

---

[1]  Father did not bring any of the usual items (bottle, clothes, diapers, etcetera) that parents bring when taking a baby on a trip, and Mother went to a store to purchase such items after Father left and did not return.

petitions.[2]  The juvenile court held a hearing on the petitions over the course of two (non-consecutive) days in February and March of 2021, and both Father and Mother testified.

Mother testified Father left N.D. with her from December 14, 2020, through December 18, 2020, and she did not know where Father was during that time.  She claimed she left the apartment building where Father asked to stop only because she got impatient (after 20 to 30 minutes), she did not call Father thereafter because his phone was in her car, and she had no concerns about Father parenting the child.  Father testified generally along the lines of his prior statement to the Department, though he added that before he asked Mother for the ride to the airport his father said he did not want Father and N.D. staying in their home because Father's grandmother had come down with pneumonia.[3]  Father also added he was inside the apartment building for 10-12 minutes "tops" until he came back outside and Mother and N.D. were gone.  Father said he was unable to call Mother or anyone else because all of the phone

[2]  "A subsequent petition is filed when new, independent allegations of dependency can be made after the court has initially declared a minor to be a dependent child.  [Citation.]  A supplemental petition is filed, inter alia, when a dependent child has been placed with a parent, but the department now seeks to remove the child, effectively requesting the court to modify its previous placement order.  [Citation.]" (*In re Barbara P.* (1994) 30 Cal.App.4th 926, 933 (*Barbara P.*).)

[3]  Father testified he planned to take N.D. with him to Wisconsin but had not obtained a social worker's approval to do that because it was "spur of the moment."

numbers were in his phone and he had not committed any to memory.[4]

The juvenile court sustained both the subsequent and supplemental petitions as pled. The court found several aspects of Father's testimony (and Mother's testimony) incredible: that Father would stop at an apartment building early in the morning before a 7:30 a.m. flight to transact unspecified business, that Father planned to take N.D. with him to Wisconsin when he had not brought any belongings along for the baby, and that Father would choose Mother to give him a ride to the airport when that "was the very person who is not supposed to have contact with the baby." As the juvenile court put it: "I don't know what they were doing that morning, but I'm not convinced [Father] was going to the airport and he intended to bring the baby with him. To be out that early in the morning . . . and not have gear for the baby when taking a flight and on a trip that is going to be two weeks long, those pieces do not fit together in a way that makes sense. Something is not being told to the court and I think that something else was going on and I think leaving the baby at all with [Mother] is a danger and that has been proven by the circumstances in that [Mother] either took off with the baby, proving herself unreliable, or as she originally said she doesn't know what happened to Father and she didn't know what to do, which means [Father] is not reliable."

Proceeding to disposition on both petitions, the juvenile court removed N.D. from Father's custody and ordered the Department to find a suitable placement for the child. In making

---

[4]    Father testified he tried to call the Department but his repeated calls were directed either to the wrong Department office or "some type of court."

6

that order, the court found "more than enough evidence for removal" because "what happened here was extraordinarily dangerous and the child essentially went missing." The court further remarked it was concerned that Father would not be completely forthcoming if N.D. were again released to him. The court ordered monitored visitation for Father and various services, including individual counseling.

## II

Father presents several challenges to the juvenile court's findings and orders, but all fail under the applicable standards of review that incorporate due deference to the court's credibility findings. Father indisputably violated the court's order prohibiting unmonitored contact between N.D. and Mother—who was previously found to pose a risk of harm to the child, as Father well knew. The juvenile court was not required to believe Father's explanation for the violation and, indeed, there is ample basis in the record for the court's decision to disbelieve it. These two observations essentially resolve all of Father's contentions on appeal: the asserted lack of sufficient evidence supporting the court's findings on the petitions and its order removing N.D. from Father's custody, plus the asserted abuse of discretion in limiting Father to monitored visitation and compelling him to participate in individual counseling.

## A

"A [Welfare and Institutions Code] section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care." (*In re T.W.* (2013) 214

7

Cal.App.4th 1154, 1161 (*T.W.*).)  To sustain such a petition, a juvenile court must find that a previous disposition order was ineffective in protecting the child.  (*In re F.S.* (2016) 243 Cal.App.4th 799, 808, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989 (*O.B.*).)  We review a Welfare and Institutions Code section 387 finding using the familiar substantial evidence standard of review, which accords deference to a juvenile court's credibility findings.  (*T.W.*, *supra*, at 1161; *In re H.G.* (2006) 146 Cal.App.4th 1, 11-12; see also *People v. Williams* (2015) 61 Cal.4th 1244, 1262 ["We defer to the trial court's credibility assessments 'based, as they are, on firsthand observations unavailable to us on appeal'"].)

"A subsequent petition is filed [under Welfare and Institutions Code section 342] when new, independent allegations of dependency can be made after the court has initially declared a minor to be a dependent child."  (*Barbara P.*, *supra*, 30 Cal.App.4th at 933.)  Akin to a juvenile court's determination of an original petition under Welfare and Institutions Code section 300, we review a court's findings sustaining a Welfare and Institutions Code section 342 petition using the same substantial evidence standard of review.  (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364.)

The same evidence supports the juvenile court's findings on both the supplemental and subsequent petitions, and that evidence is well more than substantial.  There is no dispute that, at the relevant time, Father was obviously aware the juvenile court had already assumed jurisdiction over N.D. based on a finding that Mother's drug use and mental problems presented a substantial risk of causing serious physical harm to the child. There is also no dispute that Father left N.D. in Mother's care for

a time (whether 10-12 minutes, 20-30 minutes, or over an hour, depending on which of the various accounts are believed) when visiting the apartment building early in the morning—and then left the child in Mother's custody for four days while making what are at best seen as rather minimal attempts to locate the child and regain custody of him. These facts alone (particularly leaving the child in an automobile driven by Mother, who was known to have a drug problem) establish a sufficient predicate for jurisdiction under Welfare and Institutions Code sections 342 or 387. That the juvenile court found many aspects of Father's explanation for leaving the child with Mother not credible—with good reason, based on our review of the record—only reinforces the correctness of the juvenile court's findings.

B

Father additionally challenges the juvenile court's decision to remove N.D. from his custody and order the child suitably placed by the Department. Under Welfare and Institutions Code section 361, subdivision (c), a juvenile court may not remove a child from a parent's custody unless the court finds "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present

9

circumstances. [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

We review the juvenile court's order removing N.D. from Father's custody for substantial evidence, but we apply that standard of review more stringently given the clear and convincing standard of proof that applies in the juvenile court. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154-155; see also *O.B.*, *supra*, 9 Cal.5th at 1011.) Due deference to the juvenile court's credibility determinations, however, is still required. (*O.B.*, *supra*, at 995-996 ["[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence"].)

We find it unnecessary to repeat what we have already summarized in connection with the juvenile court's findings sustaining the supplemental and subsequent petitions. Suffice it to say Father's decision to leave N.D. with Mother in violation of a court order, his implausible explanation for doing so, and his statement to the social worker that he did not believe N.D. was really his child, satisfy the somewhat more demanding standard of review and warrant affirmance of the juvenile court's removal order.

## C

The juvenile court ordered monitored visitation for Father and required him to participate in individual counseling. Neither was an abuse of discretion. (See, e.g., *In re D.P.* (2020) 44 Cal.App.5th 1058, 1070-1071 [juvenile court visitation orders and disposition case plan reviewed for an abuse of discretion] (*D.P.*).) Monitored visitation was obviously justified in light of Father's knowing disregard of prior court orders made to ensure N.D.'s safety. And the trial court was within its broad discretion (Welf. & Inst. Code, § 362, subd. (d); *D.P.*, *supra*, at 1071) to conclude individual counseling was warranted too; as the juvenile court itself explained, "Father needs to come to terms with the decisions he's made here and that is what you do in individual counseling . . . you work through the errors that were made[,] why you made them, and how you plan to avoid them."

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.